[Cite as *State v. Woods*, 2024-Ohio-467.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

STATE OF OHIO,                           :

    Plaintiff-Appellee,          :

                                     Nos. 112579 and 112580

    v.                           :

LAMARION WOODS,                          :

    Defendant-Appellant.         :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART; VACATED IN PART; AND REMANDED
**RELEASED AND JOURNALIZED:** February 8, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case Nos. CR-22-667421-A and CR-21-665387-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Sean Kilbane, Owen Knapp, and John Hirschauer, Assistant Prosecuting Attorneys, *for appellee.*

Law Office of John T. Forristal and John T. Forristal, *for appellant.*

EILEEN T. GALLAGHER, P.J.:

{¶ 1} Defendant-appellant, Lamarion Woods ("Woods"), appeals his convictions and sentence. He claims the following errors:

    1. The trial court erred by joining the felonious assault and murder cases.

2. The trial court erred by submitting the felonious assault crime scene photographs, bullet fragments, and bullet casings into evidence when the state failed to lay a proper foundation to submit photographs in CR-21-665387.

3. The trial court erred when it denied [Woods's motion to] suppress the illegally obtained evidence from the Instagram search warrant.

4. The trial court erred and violated Woods' right to a fair trial and due process when it denied Woods' motion to strike potential Juror 19 for cause.

5. Woods' constitutional rights were violated when the trial court limited cross-examination of a terminated correction officer's credibility and truthfulness.

6. The state did not establish the qualifications of the contractor lab technician who performed the ballistics testing.

7. The ballistics evidence was not reliable and should not have been submitted into evidence.

8. The trial court erred in denying Woods' Criminal Rule 29 motion for [acquittal on] the felonious assault, criminal damaging, and carrying concealed weapon charges in case CR-21-665387.

9. The trial court erred in denying Woods' Criminal Rule 29 motions for acquittal on the aggravated murder, murder, and felonious assault charges in case CR-22-667421.

10. Defense counsel rendered ineffective assistance at trial, in derogation of Woods' 6th Amendment right to counsel.

11. The trial court erred by not considering Woods' young age as a 2929.12 factor prior to sentencing.

12. The proceedings below denied Woods of his right to a fair trial under the Fifth, Sixth, and Fourteenth Amendment to the United States Constitution, because of cumulative errors during the trial of this case.

{¶ 2} We affirm Woods's convictions but vacate his sentence and remand the case to the trial court to allow the court to consider Woods's age in resentencing.

## I. Facts and Procedural History

{¶ 3} This case involves two incidents that gave rise to two separate criminal cases. In Cuyahoga C.P. No. CR-21-665387-A, Woods was charged with one count of felonious assault with one- and three-year firearm specifications (Count 1), one count of carrying a concealed weapon with a furthermore clause alleging that the weapon was loaded or ready at hand (Count 2), one count of improper use of a firearm in a motor vehicle (Count 3), and two counts of criminal damaging with furthermore clauses alleging that the violation created a risk of physical harm to others (Counts 4 and 5). The charges resulted from a shooting incident that occurred at a local convenience store located on Lee Road in Cleveland.

{¶ 4} In Cuyahoga C.P. No. CR-22-667421-A, Woods was charged one count of aggravated murder with one- and three-year firearm specifications (Count 1), two counts of murder with one- and three-year firearm specifications (Counts 2 and 3), five counts of felonious assault with one- and three-year firearm specifications (Counts 4, 5, 6, 7, and 8), and one count of discharging a firearm on or near a prohibited premises (Count 9). The charges were filed in connection with the shooting death of Canaan Cole ("Cole").

{¶ 5} Woods was 17 years old at the time of the events alleged in these cases, and the charges were originally brought in the juvenile division of the Cuyahoga County Common Pleas Court. The juvenile court granted motions for discretionary and mandatory bindovers in both cases, and a grand jury indicted Woods in two cases in the Cuyahoga County Common Pleas Court, General Division.

{¶ 6} After Woods was bound over to adult court, the state filed a joinder motion, asking the trial court to try the two cases together. The trial court granted the motion, and the two cases proceeded to a joint trial in February 2023. Detective Christopher Miller ("Detective Miller") testified that on the night of May 12, 2021, he responded to a call of gunshots fired at the Super One Market on Lee Road in Cleveland ("the Lee Road incident"). Detective Miller and other officers collected shell casings from the scene. They also reviewed surveillance footage from the store's surveillance cameras and attempted to extract the footage onto a thumb drive. They were unable to download the video footage, but the video was captured on Detective Miller's body camera. The footage, which was played for the jury and entered into evidence, depicts a male suspect in a multi-colored hoodie, black pants, dark shoes, and a hat.

{¶ 7} The victim, Kindell Toomer ("Toomer"), told police that the suspect fired several gunshots at him outside the convenience store. Toomer, who was not hit by the shots, fired one shot back at the suspect, but did not hit him either. Based on the surveillance footage and Toomer's statements to police, Detective Miller believed that the suspect in the multi-colored hoodie was the primary shooter. (Tr. 909-910.) He, therefore, created a flyer with a still shot of the suspect and circulated it to other law enforcement officers to help identify him. (Tr. 910.)

{¶ 8} The day after the shooting, Detective Matthew Zone ("Detective Zone") identified Woods from the flyer. Detective Zone, who works in the Fourth District's gang-impact unit, testified that he first met Woods in 2019, when he worked as a

patrol officer in the Fourth District. (Tr. 1031.) Since that time, Detective Zone had two other interactions with Woods and followed him on social media. (Tr. 1031.) Detective Zone had learned of Woods's Instagram account while working in the Fourth District and reviewed it regularly along with other accounts. (Tr. 1032-1034.)

{¶ 9} Less than two weeks later, on May 20, 2021, Cleveland police received reports of gunshots on Harvard Avenue near East 161st Street (the "East 161st Street incident"). A short time later, they received reports of additional gunshots fired at the BP gas station located at the Harvard and Lee intersection (the "BP gas station incident"). Detective Zara Hudson ("Detective Hudson"), who was assigned to the Fourth District major-crimes unit at the time of the shootings, testified that patrol officers responded to the location of the first shooting near East 161st Street and recovered three .40 caliber shell casings and one 9 mm shell casing. (Tr. 544.) He also reviewed surveillance camera footage from a nearby home. The surveillance footage revealed two male suspects who appeared to be shooting at an SUV that was traveling westbound on Harvard Avenue. (Tr. 549.) After the shooting, the suspects walked eastbound on Harvard Avenue in the direction of the BP gas station at the Lee-Harvard intersection. (Tr. 546.)

{¶ 10} Detective Hudson testified that the second shooting occurred at the BP gas station at the Lee-Harvard intersection a short time after the shooting near East 161st Street. The BP gas station is a five-to-ten minute walk from the location of the first shooting. Detective Hudson reviewed surveillance footage from the BP

gas station and observed that the shooters were wearing the same clothing as those depicted in the surveillance footage obtained from the home near East 161st Street. (Tr. 554.) One of the male suspects was wearing a "two-toned" black sweatshirt with a COVID mask, jeans with slits at the knees, and black shoes with a silver emblem on top. (Tr. 1399.) The other suspect was wearing a black jacket with white lines going down the sleeves. The surveillance footage from both locations was played for the jury and entered into evidence.

{¶ 11} Surveillance footage from the BP gas station shows that a dark Chevy Trailblazer entered the BP parking lot and the two suspects immediately exited the gas station store and started shooting at the Trailblazer. Cole, who was a backseat passenger, was hit by one of the bullets. Cole's cousin, Isaiah Edwards ("Edwards"), who was driving the vehicle, immediately fled the scene and drove Cole to South Pointe Hospital, where Cole was pronounced dead. Officer Sean Kiernan ("Officer Kiernan") testified that he spoke with Edwards and Mailonnie Walton ("Walton"), Cole's girlfriend. Walton and Edwards told police that Cole was shot at the BP gas station at the corner of Lee and Harvard. (Tr. 510-512.)

{¶ 12} Police recovered several 9 mm and .40 caliber shell casings from the BP gas station parking lot. (Tr. 672 and 679.) Detective Zone reviewed surveillance footage from the gas station and identified Woods as the shooter wearing the two-toned black sweatshirt and jeans with the black slits at the knees. (Tr. 1048-1049.) Detective Timothy Cramer ("Detective Cramer"), who was working as a Cleveland homicide detective, also reviewed the surveillance videos and identified Woods as

the male suspect in the two-toned sweatshirt. (Tr. 1279.) Detective Cramer testified that he knew Woods from when he worked in the major-crimes unit in the Fourth District. (Tr. 1284.) Detective Cramer explained that Woods had been previously apprehended in 2019, following a series of car thefts from the airport. (Tr. 1285.)

{¶ 13} Edward Lattyak, a ballistics expert in the Cuyahoga County Medical Examiner's Office, testified that the .40 caliber shell casings recovered from the Lee Road incident, the .40 caliber shell casings recovered from the East 161st Street incident, and the .40 caliber shell casings from the BP gas station incident were all discharged from the same .40 caliber firearm. (Tr. 1005; state's exhibit No. 279.)

{¶ 14} During the investigation, Detective Zone informed Detective Miller that Woods's Instagram name is "utwmar1." (Tr. 1052.) Based on that information, Detective Miller obtained a search warrant for Instagram records pertaining to "utwmar1." The Instagram records revealed that the account was used to send direct messages to multiple other accounts before and after the homicide. The "utwmar1" account also sent a certain cell phone number to multiple people. (Tr. 1429-1430.)

{¶ 15} Detective Richard Tusing obtained a search warrant for records pertaining to the cell phone identified in the Instagram direct messages. Alex Nichols ("Nichols"), a public safety intelligence analyst with the Ohio State Highway Patrol, analyzed the cell phone records, mapped its data, and determined that the cell phone was in the general vicinity of both the Lee Road incident, the East 161st Street incident, and the BP gas station incident.

{¶ 16} Finally, Brandon Gordon-Wheat ("Gordon-Wheat"), who used to work in the juvenile detention center, testified that he viewed the surveillance video from the BP gas station incident with Woods in the detention center. According to Gordon-Wheat, Woods admitted that he was the person depicted in the video. Woods also admitted he used a .40 caliber firearm at the time of the shooting. (Tr. 822.)

{¶ 17} After hearing all the evidence, the jury found Woods guilty on all counts and specifications. In Cuyahoga C.P. No. CR-21-665387-A, the court sentenced Woods to eight years on his felonious assault conviction in Count 1, plus three years on the attendant firearm specification to be served prior to and consecutive with the eight years on the base charge. The court also sentenced Woods to 18 months on Count 2 and fines of $250 each on Counts 4 and 5. The court ordered all counts to be served consecutively.

{¶ 18} In Cuyahoga C.P. No. CR-22-667421-A, the court merged Counts 2, 3, 4, and 5 into the aggravated murder charge alleged in Count 1 and imposed a term of life in prison with parole eligibility after 30 years on the base charge plus three years on the attendant firearm specification, to be served prior to a consecutive to the life sentence on the aggravated murder charge. The court imposed eight-year prison terms on the base charges in Counts 6, 7, and 8, and a 36-month sentence on Count 9. The trial court also imposed three-year prison terms on each of the firearm specifications attendant to Counts 6 through 9, to be served consecutive to the each of the underlying charges and ordered the prison terms on the underlying charges

to be served consecutive to one another and to the sentence imposed in Cuyahoga C.P. No. CR-21-665387-A.

{¶ 19} Woods now appeals his convictions sentence.

## II. Law and Analysis

### A. Joinder

{¶ 20} In the first assignment of error, Woods argues the trial court erred in joining the felonious assault case resulting from the Lee Road incident with the aggravated murder case resulting from the BP gas station incident. He contends he was prejudiced by the joinder.

{¶ 21} We review the trial court's ruling on joinder for an abuse of discretion. *State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 58*; State v. Webster*, 8th Dist. Cuyahoga No. 102833, 2016-Ohio-2624, ¶ 42. An abuse of discretion occurs when a court exercises its judgment in an unwarranted way regarding a matter over which it has discretionary authority. *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 35. In other words, a court also abuses its discretion "when a legal rule entrusts a decision to a judge's discretion and the judge's exercise of that discretion is outside of the legally permissible range of choices." *State v. Hackett*, 164 Ohio St.3d 74, 2020-Ohio-6699, 172 N.E.3d 75, ¶ 19. The term abuse of discretion "implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 22} Under Crim.R. 8(A), two or more offenses may be joined together if the offenses "are of the same or similar character, * * * or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct."

{¶ 23} "'The law favors joining multiple offenses in a single trial under Crim.R. 8(A) if the offenses charged are of the same or similar character.'" *State v. Lott*, 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990), quoting Crim.R. 8. *See also Dean* at ¶ 59. "Joinder is liberally permitted to conserve judicial resources, reduce the chance of incongruous results in successive trials, and diminish inconvenience to the witnesses." *State v. Schaim*, 65 Ohio St.3d 51, 58, 600 N.E.2d 661 (1992), citing *State v. Torres*, 66 Ohio St.2d 340, 343, 421 N.E.2d 1288 (1981); 2 LaFave & Israel, *Criminal Procedure* (1984) 354-355, Section 17.1.

{¶ 24} However, Crim.R. 14 requires separate trials when joinder would result in prejudice. The rule states: "If it appears that a defendant or the state is prejudiced by a joinder of offenses * * * in an indictment, information, or complaint, or by such joinder for trial together of indictments, informations or complaints, the court shall order an election or separate trial of counts * * * or provide such other relief as justice requires." Crim.R. 14.

{¶ 25} A defendant claiming error in the joinder of multiple indictments bears the burden of affirmatively showing that his or her rights were prejudiced. *State v. Gordon*, 152 Ohio St.3d 528, 2018-Ohio-259, 98 N.E.3d 251, ¶ 21, citing *Torres* at syllabus. To prevail on a claim that the trial court erred in joining multiple

indictments, the defendant must affirmatively demonstrate that (1) his rights were prejudiced; (2) at the time of the motion to sever, he provided the trial court with sufficient information so that it could weigh the considerations favoring joinder against the defendant's right to a fair trial; and (3) given the information provided to the court, it abused its discretion in refusing to separate the charges for trial. *Schaim*, 65 Ohio St.3d at 59, 600 N.E.2d 661, citing *Torres* at syllabus.

{¶ 26} The state may rebut a defendant's claim of prejudicial joinder in two ways. First, a defendant is not prejudiced by joinder if the evidence would have come in as other acts evidence under Evid.R. 404(B). *Lott*, 51 Ohio St.3d at 163, 555 N.E.2d 293. Under the second method, the state is not required to meet the stricter "other acts" admissibility test; it is simply required to show that evidence of each crime joined at trial is simple and direct. *Id.*, citing *State v. Roberts*, 62 Ohio St.2d 170, 175, 405 N.E.2d 247 (1980). A defendant is not prejudiced by joinder where the joined offenses are "'simple and direct, so that a jury is capable of segregating the proof required for each offense.'" *State v. Ferrell*, 8th Dist. Cuyahoga No. 100659, 2014-Ohio-4377, ¶ 39, quoting *State v. Fletcher*, 2d Dist. Clark No. 2003-CA-62, 2004-Ohio-4517, ¶ 41. *See also Lott* at 163.

{¶ 27} Crim.R. 12(C)(5) provides that a request for severance of charges under Crim.R. 14 must be raised prior to trial. If a defendant fails to timely file his or her motion, the right to severance of a trial is deemed waived. *State v. Day*, 8th Dist. Cuyahoga No. 108435, 2020-Ohio-5259, ¶ 69, citing *State v. O'Neal*, 6th Dist. Lucas No. L-92-279, 1993 Ohio App. LEXIS 3864, *2 (Aug. 6, 1993). Woods

opposed the state's motion for joinder and, therefore, preserved this issue for appeal.

{¶ 28} The evidence offered to prove the crimes committed in the separate cases was simple and direct. The offenses alleged in the two indictments were committed on separate dates at different locations. The first case arose from Woods's conduct at the Super One Market located on Lee Road. The second case arose from Woods's conduct at the BP station located at the Lee-Harvard intersection. Surveillance video from each location showed the different actions at the different locations. Each case also involved different victims and different lead investigators.

{¶ 29} In addition, evidence of Woods's conduct during the Lee Road incident would have been admissible in a separate trial for the murder that occurred at the BP gas station to prove the perpetrator's identity. Defense counsel argued in opening statement that this was a case of "mistaken identity." Defense counsel stated: "[T]he government is going to ask you to rely on testimony from the officers, and they're going to try to prove that it was our client, Lamarion Woods, that should be charged with these crimes."

{¶ 30} Evidence that a defendant committed a crime other than the one for which he is on trial is generally not admissible for purposes of establishing that the accused has a propensity to commit crimes or that he acted in conformity with bad character. *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 15. However, evidence of other crimes, wrongs, or acts may be admissible "for

other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B).

{¶ 31} In *Williams*, the Ohio Supreme Court set forth the following three-step analysis for determining whether other acts evidence is admissible:

> The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Evid.R. 401. The next step is to consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B). The third step is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice. See Evid.R. 403.

*Williams* at ¶ 20.

{¶ 32} Detective Zone identified Woods as the perpetrator of the offenses committed in the Lee Road incident on May 12, 2021, and of the offenses committed in the B.P. gas-station incident on May 20, 2021. In both instances, Detective Zone identified Woods from surveillance camera footage taken from the crime scene. The state also introduced ballistics evidence demonstrating that the .40 caliber shell casings found at the Lee Road crime scene matched those found at the BP gas station immediately after the crimes occurred.

{¶ 33} The ballistics evidence corroborated Detective Zone's identification of Woods as the perpetrator at both crime scenes. Detective Zone's testimony identifying Woods, as corroborated by the ballistics evidence, made the identification of Woods as the shooter more probable than it would have been

without the evidence. The evidence was necessary for the legitimate purpose of establishing the perpetrator's identity. Therefore, the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice, and it would have been admissible to establish identity under Evid.R. 404(B).

{¶ 34} Evidence from the two separate incidents was simple and direct. And because the evidence of the earlier crimes would have been admissible in a trial of the later crimes, Woods cannot demonstrate that he was prejudiced by the joinder of the two cases. Accordingly, the first assignment of error is overruled.

### B. Photographs

{¶ 35} In the second assignment of error, Woods argues the trial court erred in allowing photographs of bullet fragments and shell casings taken from the Lee Road incident into evidence when the state failed to lay a proper foundation for the evidence.

{¶ 36} Sergeant Joseph Rini ("Sergeant Rini") was the crime scene and records unit sergeant who supervised the collection of evidence from the Lee Road crime scene. However, Sergeant Rini, himself, did not take any of the photographs of the evidence. (Tr. 949-950.) Woods argues that Sergeant Rini had no personal knowledge of the crime scene or the evidence collected from it and, therefore, was not qualified to authenticate the photographs taken from the scene.

{¶ 37} The admission of evidence lies within the broad discretion of a trial court, and a reviewing court will not disturb evidentiary decisions in the absence of

an abuse of discretion that has created material prejudice. *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 43.

{¶ 38} Evid.R. 901 governs the authentication of evidence prior to its admissibility and states: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Evid.R. 901(A). Evid.R. 901(B)(1) further provides that evidence may be properly authenticated by testimony of witness with knowledge that "a matter is what it is claimed to be."

{¶ 39} "The authentication requirement of Evid.R. 901(A) is a low threshold that does not require conclusive proof of authenticity, but only sufficient foundation evidence for the trier of fact to conclude that the evidence is what its proponent claims it to be." *State v. Toudle*, 8th Dist. Cuyahoga No. 98609, 2013-Ohio-1548, ¶ 21, citing *Yasinow v. Yasinow*, 8th Dist. Cuyahoga No. 86467, 2006-Ohio-1355, ¶ 81, citing *State v. Easter*, 75 Ohio App.3d 22, 598 N.E.2d 845 (4th Dist.1991); Evid.R. 901(B)(1).

{¶ 40} Testimony by a witness with knowledge "that a matter is what it is claimed to be," is an acceptable method of authentication. *Id.*; Evid.R. 901(B)(1). The evidentiary standard for authentication "is less demanding than the preponderance of the evidence." *State v. White*, 4th Dist. Scioto No. 03CA2926, 2004-Ohio-6005, ¶ 61. And circumstantial evidence can be used to provide authentication. *State v. Paster*, 2014-Ohio-3231, 15 N.E.3d 1252, ¶ 32 (8th Dist.).

{¶ 41} Sergeant Rini testified that he supervised the crime scene detectives who photographed the Lee Road crime scene and collected and processed evidence from the scene. (Tr. 950.) As the supervisor, he reviewed the photographs from the scene and reviewed the crime scene detective's report. Moreover, Sergeant Rini testified that he recognized the photographs from the crime scene. After reviewing the photographs, evidence, and report, Sergeant Rini concluded that all the proper police procedures were followed. (Tr. 964.)

{¶ 42} The state offered Sergeant Rini's testimony to show that the photographs of the Lee Road crime scene were taken as part of the investigation. There is nothing in the record to suggest that the photographs introduced at trial were from some other crime scene. Although Sergeant Rini did not take the photographs himself, he had sufficient knowledge to establish that the photographs were from the Lee Road crime scene.

{¶ 43} The second assignment of error is overruled.

### C. Motion to Suppress

{¶ 44} In the third assignment of error, Woods argues the trial court erred in denying his mid-trial motion to suppress evidence obtained pursuant to a search warrant issued for his Instagram records. He contends the affidavit submitted in support of the request for the search warrant contained materially false statements.

{¶ 45} A motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. When considering a motion to suppress, the trial court assumes the role of trier of fact and

is, therefore, in the best position to resolve factual questions and evaluate the credibility of witnesses. *Id.* Consequently, an appellate court must defer to the trial court's findings of fact if they are supported by competent, credible evidence. *Id.* An appellate court, however, must independently determine as a matter of law, without deference to the trial court's conclusion, whether the facts meet the applicable standard. *State v. Hill*, 8th Dist. Cuyahoga Nos. 83762 and 83775, 2005-Ohio-3155, ¶ 12.

{¶ 46} "The Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution provide that search warrants may only be issued upon probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the person and/or things to be seized." *State v. Ojezua*, 2d Dist. Montgomery No. 28118, 2020-Ohio-303, ¶ 29. "'The security of one's privacy against arbitrary intrusion by the police—which is at the core of the Fourth Amendment [—] is basic to a free society.'" *State v. Castagnola*, 145 Ohio St.3d 1, 2015-Ohio-1565, 46 N.E.3d 638, ¶ 33, quoting *Wolf v. Colorado*, 338 U.S. 25, 27, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949).

{¶ 47} "There is * * * a presumption of validity with respect to the affidavit supporting [a] search warrant." *Franks v. Delaware*, 438 U.S. 154, 172, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). "To successfully attack the veracity of a facially sufficient search warrant affidavit, a defendant must show by a preponderance of the evidence that the affiant made a false statement, either 'intentionally, or with reckless disregard for the truth.'" *State v. Waddy*, 63 Ohio St.3d 424, 441, 588

N.E.2d 819 (1992), quoting *Franks* at 155-156. "'Reckless disregard' means that the affiant had serious doubts about the truth of an allegation." *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 31, citing *United States v. Williams*, 737 F.2d 594, 602 (7th Cir.1984).

{¶ 48} "'Omissions count as a false statement if 'designed to mislead, or * * * made in reckless disregard of whether they would mislead, the magistrate.'" *Id.*, quoting *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir.1990) "Before an omission can be considered material, the defendant must show that the omission would have materially influenced the magistrate such that if the omission had been included in the affidavit it would have negated probable cause for issuance of the warrant." *State v. Wilhelm*, 6th Dist. Lucas No. L-83-014, 1983 Ohio App. LEXIS 14912 (Sept. 2, 1983).

{¶ 49} Detective Miller was the lead investigator of the Lee Road incident. As part of his investigation, he signed an affidavit to obtain a search warrant for Woods's Instagram account with the username "utwmar1." (Tr. 919-920.) Detective Zone explained that Instagram stories are automatically deleted every 24 hours, but the data is saved on Instagram servers and can be obtained by law enforcement with a search warrant. (Tr. 1121-1123.) Detective Zone testified at trial that he had seen photographs of Woods on Instagram wearing the same multi-colored sweatshirt seen in the Super One Market surveillance video around the time of the Lee Road incident. (Tr. 1053.) The state requested the Instagram records apparently hoping to obtain a picture of Woods wearing the same multi-colored sweatshirt. (Tr. 925.)

However, when the state obtained the Instagram records, there were no photographs of Woods wearing the multi-colored sweatshirt.

{¶ 50} Detective Zone never testified at trial that he saw Woods wearing the multi-colored hoodie on his Instagram account with the username utwmar1. He stated that he saw the photograph of Woods in the multi-colored hoodie on an Instagram account belonging to one of Woods's associates. (Tr. 1053.) In the motion to suppress, Woods argued that Detective Miller did not obtain a search warrant for the correct account, and Detective Zone knew the account that should have been sought.

{¶ 51} The affidavit submitted in support of the search warrant is not in the record. However, when defense counsel filed the motion to suppress the Instagram records, the state read the following portions of Detective Miller's affidavit into the record:

> [I]n the affidavit under paragraph nine, it indicates: Affiant, who is Detective Chris Miller, avers that Detective Matthew Zone has monitored several social media accounts associated with the Skeem Team and for over one year has monitored Lamarion Woods through social media, including the social media accounts of his known associates.
>
> Number ten: Affiant has affirmed that Detective Matthew Zone identified Lamarion Woods' Instagram account handle as utwmar1.
>
> Paragraph 11: Affiant avers that Detective Zone observed Lamarion Woods on Instagram the day before the felonious assault shooting wearing the exact same clothing as a suspect in a felonious assault/shooting on May 12 of 2021.

{¶ 52} Detective Zone testified that, as part of his job as a Cleveland police detective, he routinely viewed Instagram accounts, including those of Woods and his associates. (Tr. 1032-1034.) Detective Zone stated that he knew the name of Woods's Instagram account was "utwmar1." He also stated that he had seen Woods wearing the same multi-colored hoodie in a photograph on one of his associat's Instagram accounts either the day of or the day before the Lee Road incident. (Tr. 1053.) Comparing Detective Zone's trial testimony to the portions of the search warrant affidavit read into the record, we find nothing inconsistent or untruthful about the statements in the search-warrant affidavit.

{¶ 53} Further, the existence of Woods's photographs on his associates Instagram accounts indicates a likely possibility that there would be more photographs on Woods's own account that could help identify him as the shooter. Whether the possibility was sufficient to establish probable cause to search Woods's Instagram account is impossible to determine because the search warrant affidavit is not part of the record. Therefore, Woods cannot establish that the search warrant affidavit was invalid.

{¶ 54} The third assignment of error is overruled.

### D. Juror No. 19

{¶ 55} In the fourth assignment of error, Woods argues the trial court erred in denying his motion to excuse juror No. 19 for cause. Juror No. 19 had stated in voir dire that she "was opposed to guns." (Tr. 180.) Woods asserts that juror No. 19 indicated she would not be fair and impartial due to her anti-gun sentiments.

{¶ 56} R.C. 2945.25(B) provides that a prospective juror may be challenged for cause "if the person is possessed of a state of mind evincing enmity or bias toward the defendant or the state[.]"  Pursuant to R.C. 2313.17(B)(9), a potential juror may also be challenged for cause if the person "discloses by the person's answers that the person cannot be a fair and impartial juror or will not follow the law as given to the person by the court."

{¶ 57} Trial courts have broad discretion in determining a juror's ability to be fair and impartial, and we will not disturb that determination absent an abuse of discretion.  *State v. Smith*, 80 Ohio St.3d 89, 105, 684 N.E.2d 668 (1997).  "Resolution of the impartiality issue rests in large part on the trial court's assessment of the juror's credibility and demeanor, and the context in which the issue arises." *State v. Lloyd*, 8th Dist. Cuyahoga No. 109128, 2021-Ohio-1808, ¶ 17, citing *Skilling v. United States*,  561 U.S. 358, 386, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010); *State v. Williams*, 79 Ohio St.3d 1, 8, 679 N.E.2d 646 (1997).  We, therefore, defer to the trial judge, who is in the best position to see and hear the juror in the absence of an abuse of discretion. *Id.*, citing *Chang v. Cleveland Clinic Found.*, 8th Dist. Cuyahoga No. 82033, 2003-Ohio-6167, ¶ 6.

{¶ 58} Despite Woods's argument to the contrary, the record shows that juror No. 19 indicated she could be fair and impartial.  When asked to further explain her "anti-gun" stance, she stated: "I guess it's the circumstances of what all happened and went down, the situation.  I just — not knowing anything else — I'm just letting you know I'm opposed to guns." (Tr. 182.)  Upon further questioning at

sidebar, juror No. 19 indicated that her husband and her son own guns and that she could follow the law and hold the government to its burden of proof. (Tr. 182, 185, 187.) She also stated that she would be "open to applying the law to the facts." (Tr. 180.) When asked if she could listen to the facts and apply the law without any preconceived bias to any party, she replied "I can listen to it objectively." (Tr. 188.)

{¶ 59} Juror No. 19 expressed reservations due to her concerns about gun violence and the serious nature of the charges. (Tr. 188.) These are common concerns among people. But juror No. 9 ultimately confirmed that she could keep an open mind, hold the state to its burden of proof, and listen to the evidence objectively. Therefore, the trial court acted within its discretion in denying Woods's motion to excuse juror No. 19 for cause.

{¶ 60} The fourth assignment of error is overruled.

### E. Corrections Officer Testimony

{¶ 61} In the fifth assignment of error, Woods argues his constitutional rights were violated when the trial court limited his cross-examination of a terminated juvenile corrections officer. He contends the trial court prevented him from impeaching the witness's credibility.

{¶ 62} The constitutional right of cross-examination includes the right to impeach a witness's credibility. *State v. Green*, 66 Ohio St.3d 141, 147, 609 N.E.2d 1253 (1993). Evid.R. 611(B) takes a broad approach to cross-examination and permits "'[c]ross-examination * * * on all relevant matters and matters affecting

credibility.'" *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 171.

{¶ 63} However, trial courts may impose reasonable limits on the scope of cross-examination to prevent harassment, prejudice, confusion of the issues, or repetitive, marginally relevant interrogation. *State v. Bolton*, 8th Dist. Cuyahoga No. 96385, 2012-Ohio-169, ¶ 41, citing *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). "It is within the trial court's broad discretion to determine whether testimony is relevant, and to balance its potential probative value against the danger of unfair prejudice." *Id.*, citing *In re Fugate*, 2d Dist. Darke No. 1512, 2000 Ohio App. LEXIS 4306 (Sept. 22, 2000). We, therefore, will not disturb the trial court's decision to limit cross-examination absent an abuse of discretion. *Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, at ¶ 43.

{¶ 64} While cross-examining Gordon-Wheat, defense counsel tried to impeach his credibility by asking him why he was terminated by the juvenile corrections center. Defense counsel asked questions regarding multiple instances in which Gordon-Wheat was disciplined prior to his termination. Counsel asked if he was written up for being rude, if he was suspended several times for being late for work, and if he was written up for taking inconsistent break times. (Tr. 830-834.) The state objected each time, and the objections were sustained. Eventually, defense counsel asked Gorden-Wheat if he was written up for dishonesty. (Tr. 834.) Before the state could object, Gordon-Wheat denied being disciplined for dishonesty. (Tr. 834.) When the state objected, the objection was sustained. Defense counsel

nevertheless continued to probe the issue, and the trial court held a discussion at sidebar wherein it was acknowledged that there was no evidence that Gordon-Wheat had ever been reprimanded for dishonesty. (Tr. 834.)

{¶ 65} Defense counsel asked numerous questions in an attempt to attack Gordon-Wheat's credibility, and the trial court granted defense counsel wide latitude in doing so. However, the court put a stop to the questioning when it became apparent that there was no evidence to support the questions, and the questions were not relevant to the facts in issue. Therefore, the trial court acted well within its discretion in limiting the cross-examination.

{¶ 66} The fifth assignment of error is overruled.

### F. Ballistic Expert Qualifications

{¶ 67} In the sixth assignment of error, Woods argues the trial court erred in admitting the state's ballistics expert's testimony into evidence. He contends the evidence was inadmissible because the state failed to establish the qualifications of the technician who actually performed the testing.

{¶ 68} Defense counsel did not object when the state moved to have Lattyak declared a ballistics expert. (Tr. 988.) Therefore, defense forfeited all but plain error. *State v. White*, 8th Dist. Cuyahoga No. 110452, 2022-Ohio-2130, ¶ 36 (Failure to object to expert testimony forfeits all but plain error.). Crim.R. 52(B) authorizes appellate courts to correct "'[p]lain errors or defects affecting substantial rights' notwithstanding the accused's failure to meet his obligation to bring those errors to the attention of the trial court." *Id*. at ¶ 22, quoting Crim.R. 52(B). To prevail under

a plain-error analysis, the appellant bears the burden of demonstrating that, but for the error, the outcome of the trial would clearly have been different. *State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306, ¶ 17.

{¶ 69} Under Evid.R. 702, a witness may testify as an expert if (1) "[t]he witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons"; (2) "[t]he witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony"; and (3) "[t]he witness' testimony is based on reliable scientific, technical, or other specialized information." *Lucsik v. Kosdrosky*, 2017-Ohio-96, 79 N.E.3d 1284, ¶ 5 (8th Dist.).

{¶ 70} A determination that a witness is qualified to testify as an expert is a matter within the discretion of the trial court and will not be reversed absent and abuse of discretion. *State v. Lumbus*, 2016-Ohio-380, 59 N.E.3d 580, ¶ 95 (8th Dist.).

{¶ 71} Defense counsel did not object to Lattyak's expert testimony at trial, and Woods does not dispute Lattyak's qualifications to testify as an expert on appeal. He contends the trial court should have excluded his testimony because there was no evidence presented regarding the qualifications of the technician who performed the ballistics testing in this case. Although another technician conducted the ballistics testing, Lattyak testified that he was the firearms-section supervisor and that he was the technical reviewer in this case. (Tr. 996.) As the technical reviewer,

Lattyak analyzed the submitted shell casings under a microscope to verify the findings made by the examiner who performed the tests. (Tr. 997.) After reviewing the examiner's work, Lattyak signed off on the ballistics report. (Tr. 999.) Therefore, not only was Lattyak qualified as a ballistics expert, he personally reviewed the evidence and validated the report based on personal knowledge. This evidence is sufficient to verify the evidence and to render the qualifications of the other ballistics examiner irrelevant. Lattyak was qualified to testify about the ballistics testing conducted in this case both because he was a ballistics expert and because he had personal knowledge of the testing itself.

{¶ 72} The sixth assignment of error is overruled.

### G. Reliability of Ballistics Evidence

{¶ 73} In the seventh assignment of error, Woods argues the ballistics evidence linking the bullet recovered from Cole's body with the shell casings found at the Lee Road and BP Gas station crime scenes was not reliable and should not have been admitted into evidence. In support of his argument, Woods relies on the Maryland Supreme Court's recent decision in *Abruquah v. State*, 483 Md. 637, 296 A.3d 961 (2023).

{¶ 74} Defense counsel did not raise this issue in the trial court and, therefore, forfeited all but plain error. *White*, 8th Dist. Cuyahoga No. 110452, 2022-Ohio-2130, at ¶ 36. As previously stated, to prevail on a claim of plain error, the appellant must demonstrate that, but for the error, the outcome of the trial would

clearly have been different. *Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306, ¶ 17.

{¶ 75} In *Abruquah*, the court held, in a four-to-three decision, that a ballistics expert can testify that bullets at a crime scene are consistent with patterns on bullets fired from a suspect's gun but cannot offer an "unqualified opinion" of a match between them. *Id.* at 948. The court explained that the reports, studies, and testimony relied on by the examiner did not demonstrate that the firearms identification methodology employed in the case could reliably support an unqualified conclusion that the bullets were fired from a particular firearm. *Id.*

{¶ 76} In reaching its decision, the majority in *Abruquah* applied the recently adopted *Daubert-Rochkind* standard for evaluating scientific evidence under the Maryland evidentiary rule governing expert testimony. *Id.* at 679-680, citing *Rochkind v. Stevenson*, 471 Md. 1, 35, 236 A.3d 630 (2020). The *Daubert-Rochkind* standard prescribes ten factors trial courts must consider in determining the admissibility of scientific evidence under Mayland law. *Rochkind* at 35-36; *Abruquah* at 680-695. The factors include the nonexhaustive list of five factors outlined in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), plus five -additional factors. *Rochkind* at 35-36, *Abruquah* at 699-700 (Hotten, J., dissenting).

{¶ 77} The *Daubert-Rochkind* standard has not been adopted in Ohio. The admissibility of expert testimony in Ohio is governed by Evid.R. 702 and 703 of the Ohio Rules of Evidence, and the United States Supreme Court decision in *Daubert*.

*Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 687 N.E.2d 735 (1998) (Ohio has adopted the *Daubert* test for determining the reliability of an expert's opinion.). We are, therefore, duty-bound to follow Evid.R. 702 and 703 and *Daubert* and its progeny when evaluating a trial court's decision to admit expert testimony into evidence.

{¶ 78} Evid.R. 702 permits a witness to testify as an expert only if his opinion or testimony will aid the trier of fact in the search for truth. *State v. Clark*, 101 Ohio App.3d 389, 655 N.E.2d 795 (8th Dist.1995). An expert's testimony assists the trier of fact if it meets a threshold standard of reliability. *Daubert* at 589-590. *See also* 1994 Staff Notes to Evid.R. 702. The trial court should not accept the expert's opinion at face value; it must independently examine and evaluate the reliability of each expert's opinion. *Walker v. Ford Motor Co.*, 8th Dist. Cuyahoga No. 100759, 2014-Ohio-4208, ¶ 27. The proponent of the expert bears the burden of demonstrating that the expert's testimony satisfies the *Daubert* standard by a preponderance of the evidence. *Id.* at ¶ 25.

{¶ 79} In *Daubert*, the court enumerated a list of five nonexhaustive factors courts must consider when determining whether scientific evidence is reliable. *Id.* at 593-594. These factors include (1) whether the theory or technique has been tested, (2) whether the theory or technique has been subjected to peer review, (3) whether a particular scientific technique has a known or potential rate of error, (4) the existence and maintenance of standards and controls, and (5) whether the methodology has gained general acceptance. *Id.* at 593-594. These factors are

intended to assist the trial court in its duty to ensure that expert testimony is based on the scientific method. *Id.* at 590.

{¶ 80} In defining the scientific method, the *Daubert* Court stated that "[s]cientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry." *Id.* at 593. The focus of the *Daubert* inquiry is "solely on principles and methodology, not on the conclusions that they generate." *Daubert* at 595. *See also Miller*, 80 Ohio St.3d 607 at 611, 687 N.E.2d 735. The issue is not whether the testimony itself is correct but whether the data, methods, and processes relied upon to generate the expert opinions can be trusted to generate reliable information. *Id.* at 614.

{¶ 81} The trial court's role in evaluating the admissibility of expert testimony is that of a gatekeeper. However, its role is not to determine the scientific validity of any scientific conclusions but rather "to determine whether the principles and methodology underlying the testimony itself are valid." *United States v. Bonds*, 12 F.3d 540, 556 (6th Cir.1993). "[C]ourts should not pre-adjudicate the weight of expert testimony." *United States v. Kaur*, E.D. Va No. 3:23cr92, 2023 U.S. Dist. LEXIS 223698 (Dec. 13, 2023), *13-14.

{¶ 82} In setting forth its nonexhaustive list of factors, the *Daubert* Court observed that "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." "If the admissibility question is close,

any doubt or 'tie' should be resolved in favor of admitting the expert." *Kaur,* citing *Mack v. Amerisource Bergen Drug Corp.*, 671 F.Supp.2d 706, 709 (D. Md. 2009).

{¶ 83} Lattyak testified that he had previously testified as an expert in the field of firearm and tool marking in various courts, including courts in Cuyahoga County, Ohio. (Tr. 987-988.) Ohio courts have generally accepted forensic ballistic comparison testing Lattyak used in this case as a reliable method of expert analysis and opinion. *See State v. Fuell*, 2021-Ohio1627, 172 N.E.3d 1065, ¶ 52 (12th Dist.), citing *State v. Quiller*, 10th Dist. Franklin No. 15AP-934, 2016-Ohio-8163, ¶ 30 (noting that Ohio courts have generally found tool mark and ballistics analysis to be reliable and finding that the trial court did not err in allowing testimony of expert witness on tool mark and ballistics analysis); *State v. Langlois*, 2013-Ohio-5177, ¶ 40, 2 N.E.3d 936, ¶ 40 (6th Dist.) ("Such microscopic comparison testing is a generally accepted method of forensic analysis."); *State v. Johnson*, 10th Dist. Franklin No. 05AP-12, 2006-Ohio-209, ¶ 15 ("Given [the ballistics and tool mark expert's] explanation of his methodology, the trial court did not abuse its discretion by admitting his testimony, as his opinion was based on reliable, commonly accepted scientific * * * principles"); *State v. Armstrong*, 11th Dist. Trumbull Nos. 2001-T-0120 and 2002-T-0071, 2004-Ohio-5635, at ¶ 66 ("The testimony given by [the expert] confirms that the tool-mark analysis technique is sufficiently reliable to aid the jury in reaching accurate results.").

{¶ 84} Based on the foregoing, the trial court acted within its discretion in allowing Lattyak to provide expert testimony regarding his analysis of the shell

casings found at the crimes scenes and the bullet fragment recovered from Woods's body.  Accordingly, the seventh assignment of error is overruled.

## H. Sufficiency of the Evidence

{¶ 85} In the eighth assignment of error, Woods argues the trial court erred in denying his Crim.R. 29 motion for acquittal as to the felonious assault, criminal damaging, and carrying a concealed weapons charges alleged in Cuyahoga C.P. 21-CR-665387-A.  In the ninth assignment of error, Woods argues the trial court erred in denying his Crim.R. 29 motion for acquittal as to the aggravated murder, murder, felonious assault, and discharge of a firearm on or near prohibited a prohibited premises alleged in Cuyahoga C.P. 21-CR-667421.  We discuss these assigned errors together because they all relate to the sufficiency of the evidence.

{¶ 86} Crim.R. 29(A) provides that a court "shall order the entry of the judgment of acquittal of one or more offenses * * * if the evidence is insufficient to sustain a conviction of such offense or offenses."  "Because a Crim.R. 29 motion questions the sufficiency of the evidence, '[w]e apply the same standard of review to Crim.R. 29 motions as we use in reviewing the sufficiency of the evidence.'" *Fairview Park v. Peah*, 8th Dist. Cuyahoga No. 110128, 2021-Ohio-2685, ¶ 37, quoting *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37.

{¶ 87} The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial.  *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12.  The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier

of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. In a sufficiency review, courts assess not whether the state's evidence is to be believed, but whether, if believed, the evidence against the defendant would support a conviction. *In re D.W.*, 8th Dist. Cuyahoga No. 79262, 2002-Ohio-4173, ¶ 34.

{¶ 88} "'Proof of guilt may be made by circumstantial evidence, real evidence, and direct evidence, or any combination of the three, and all three have equal probative value.'" *State v. Rodano*, 2017-Ohio-1034, 86 N.E.3d 1032, ¶ 35 (8th Dist.), quoting *State v. Zadar*, 8th Dist. Cuyahoga No. 94698, 2011-Ohio-1060, ¶ 18. Although circumstantial evidence and direct evidence have obvious differences, those differences are irrelevant to the probative value of the evidence, and circumstantial evidence carries the same weight as direct evidence. *Id.*, citing *State v. Cassano*, 8th Dist. Cuyahoga No. 97228, 2012-Ohio-4047, ¶ 13. Circumstantial evidence is not only sufficient, "'"but may also be more certain, satisfying, and persuasive than direct evidence."'" *Id.* at ¶ 36, quoting *State v. Hawthorne*, 8th Dist. Cuyahoga No. 96496, 2011-Ohio-6078, quoting *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960).

### 1. Felonious Assault — CR-21-665387-A

{¶ 89} Woods argues there was insufficient evidence presented at trial to support his felonious assault conviction in Cuyahoga C.P. 21-CR-665387-A because (1) Toomer, the victim, did not testify at trial; (2) the surveillance video does not

show Woods firing a gun at Toomer; and (3) the physical and photographic evidence linking Woods to the crime were improperly admitted into evidence.

{¶ 90} Woods was charged with felonious assault in violation of R.C. 2903.11(A)(2), which states that "[n]o person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."

{¶ 91} Surveillance video footage, which was captured on Detective Miller's body camera and entered into evidence, shows Woods and Toomer talking to each other outside the Super One Market on Lee Road. (Tr. 899-900, state's exhibit No. 1201.4.) Another video, captured from a different angle, shows Woods, in his multi-colored sweatshirt, firing his gun in Toomer's direction. (State's exhibit No. 1201.2.) The state's video, marked as state's exhibit No. 1201.4, shows Toomer's response to the shooting; he retrieves his own gun from his car and fires back at Woods.

{¶ 92} The physical and photographic evidence linking Woods to the crime was properly authenticated under Evid.R. 901, and testified to by Lattyak. Although Toomer did not testify at trial, Toomer told police that Woods was the primary shooter, and there is no requirement that a victim must testify in order to obtain a conviction. Therefore, there was sufficient evidence to support Woods's felonious assault conviction.

## 2. Criminal Damaging

{¶ 93} Woods was charged with two counts of criminal damaging in violation of R.C. 2909.06(A)(1), which states that "[n]o person shall cause, or create a

substantial risk of physical harm to any property of another without the other person's consent * * * [k]nowingly, by any means[.]" The charges alleged that Woods damaged a 2003 Ford F150 and a 2007 Cadillac when he fired gunshots at Toomer in the Super One Market parking lot. Both vehicles were damaged by bullets. Woods argues the state failed to present evidence that Woods caused the damage because the owners of the vehicles did not testify at trial.

{¶ 94} However, Detective Miller contacted the owners of the vehicles, and they reported that their vehicles were damaged during the shooting. (Tr. 913-915.) Woods contends the victims' statements to police constituted hearsay and, therefore, could not be used to link Woods to the crime. However, the victims' statements were offered to explain the police investigation and were, therefore, not hearsay. *State v. Davis*, 62 Ohio St.3d 326, 343, 581 N.E.2d 1362 (1991) (A statement is not hearsay when offered for a purpose other than to prove the truth of the matter asserted.). Moreover, video footage of the shooting shows Woods shooting across the parking lot where the cars were parked. Based on this evidence, the jurors could reasonably infer that the vehicles were damaged during the shooting. Therefore, there was sufficient evidence to support Woods's criminal damaging convictions.

### 3. Carrying Concealed Weapon

{¶ 95} Woods was charged with carrying a concealed weapon in violation of R.C. 2923.12(A)(2). He contends there was insufficient evidence to support his conviction because no witness testified that he or she saw Woods with a handgun,

either concealed or brandished. He argues a surveillance video is the only evidence the state offered to show Woods with a gun.

{¶ 96} R.C. 2923.12(A)(2), which governs carrying concealed weapons, provides that "[n]o person shall knowingly carry or have, concealed on the person's person or concealed ready at hand * * * [a] handgun[.]" As previously stated, surveillance camera footage shows Woods shooting a handgun in the Super One Market parking lot. Surveillance cameras inside the store show Woods walking around prior to the shooting, and the gun is not visible anywhere on his person. Therefore, there was sufficient evidence that Woods concealed the handgun in violation of R.C. 2923.12(A)(2).

### 4. Aggravated Murder

{¶ 97} Woods was convicted of aggravated murder in violation of R.C. 2903.01(A), which states, in relevant part, that "[n]o person shall purposely, and with prior calculation and design, cause the death of another[.]"

> A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature.

R.C. 2901.22(A). "'The law has long recognized that intent, lying as it does within the privacy of a person's own thoughts, is not susceptible to objective proof.'" *State v. Worley*, 164 Ohio St.3d 589, 2021-Ohio-2207, 174 N.E.3d 754, ¶ 64, quoting *State v. Garner*, 74 Ohio St.3d 49, 60, 656 N.E.2d 623 (1995). "Therefore, intent may be established from the surrounding facts and circumstances in the case." *Id.*

{¶ 98} "The phrase 'prior calculation and design' by its own terms suggests advance reasoning to formulate the purpose to kill." *State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, ¶ 18. The phrase is not defined in the Ohio Revised Code. Nevertheless, the Ohio Supreme Court has interpreted it "to require evidence of 'more than [a] few moments of deliberation'" and "'a scheme designed to implement the calculated decision to kill.'" *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 38, quoting *State v. Cotton*, 56 Ohio St.2d 8, 381 N.E.2d 190 (1978), paragraph one of the syllabus.

{¶ 99} "Instantaneous deliberation is not sufficient to constitute 'prior calculation and design.'" *Cotton* at paragraph two of the syllabus. "'[N]either the degree of care nor the length of time the offender takes to ponder the crime beforehand'" is a "'critical factor'" in and of itself so long as it amounts to more than "'momentary deliberation.'" *State v. D'Ambrosio*, 67 Ohio St.3d 185, 196, 616 N.E.2d 909 (1993), quoting the 1973 Legislative Service Commission Comment to R.C. 2903.01. Although "'momentary deliberation' is insufficient," "prior calculation and design can be found even when the killer quickly conceived and executed the plan to kill within a few minutes." *State v. Coley*, 93 Ohio St.3d 253, 264, 754 N.E.2d 1129 (2001).

{¶ 100} The state can prove "prior calculation and design" from the circumstances surrounding a murder in several ways, including (1) "evidence of a preconceived plan leading up to the murder," (2) "evidence of the [defendant's] encounter with the victim, including evidence necessary to infer that the defendant

had a preconceived notion to kill regardless of how the [events] unfolded," or (3) "evidence that the murder was executed in such a manner that circumstantially proved the defendant had a preconceived plan to kill," such as where the victim is killed in a cold-blooded, execution-style manner. *State v. Orr*, 8th Dist. Cuyahoga No. 100841, 2014-Ohio-4680, ¶ 75.

{¶ 101} Although there is no "bright-line test" for determining the presence or absence of prior calculation and design; the Ohio Supreme Court has identified several factors to be weighed together with the totality of the circumstances surrounding the murder to determine the existence of prior calculation and design, including (1) whether the defendant and the victim knew each other and, if so, (2) whether the relationship was strained; (3) whether there was thought or preparation in choosing the murder weapon or murder site; and (4) whether the act was "drawn out" or "an almost instantaneous eruption of events." *State v. Taylor*, 78 Ohio St.3d 15, 19, 676 N.E.2d 82 (1997), citing *State v. Jenkins*, 48 Ohio App.2d 99, 102, 355 N.E.2d 825 (8th Dist.1976); *see also State v. Woods*, 8th Dist. Cuyahoga No. 99630, 2014-Ohio-1722, ¶ 25.

{¶ 102} Whether a defendant acted with prior calculation and design is determined on a case-by-case basis, following an analysis of the specific facts and evidence presented at trial. *Orr* at ¶ 77; *State v. Jones*, 91 Ohio St.3d 335, 345, 744 N.E.2d 1163 (2001); *see also Cotton* at paragraph three of the syllabus. ("Where evidence adduced at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the

circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified.").

{¶ 103} Several surveillance cameras with multiple views show Woods and his unknown associate at the BP gas station. Footage from inside the store suggests that Woods and his associate were waiting for something. The video shows Woods standing by the cash register as his associate looks out the front door as if he were looking for someone. Shortly thereafter, he joins Woods by the cash register. But a moment later, Woods taps his associate on the shoulder just as the Chevy Trailblazer pulls into the parking lot. Woods and his associate immediately step outside the front entrance of the store where the Trailblazer had just parked.

{¶ 104} Footage from exterior surveillance cameras show Woods and his associate briefly confront the occupants of the Trailblazer before firing several gunshots into the vehicle. Although there is no evidence that Woods had a strained relationship with the victim, the video footage establishes that he was waiting for the victim's vehicle to arrive and that he began shooting into the vehicle almost immediately upon its arrival. The circumstances presented in the surveillance footage provides sufficient evidence to support Woods's aggravated murder conviction.

## 5. Murder

{¶ 105} Woods was convicted of murder in violation of R.C. 2903.02, which states that "[n]o person shall purposely cause the death of another[.]"  He argues there is no evidence that he acted purposely.  As previously stated:

> A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby,  it is the offender's specific intention to engage in conduct of that nature.

R.C. 2901.22(A).  Surveillance footage from the exterior of the BP gas station shows Woods aiming a handgun at the Trailblazer and firing multiple gunshots at it.  This evidence is sufficient to establish that Woods intended to hit the occupants of the Trailblazer with the bullets fired from his gun.  He knew the occupants of the Trailblazer would likely be hit by his bullets.  Therefore, there is sufficient evidence to support Woods's murder conviction.

## 6. Felonious Assault — CR-22-667421-A

{¶ 106} In CR-22-667421-A, Woods was convicted of five counts of felonious assault in violation of R.C. 2903.11(A)(2), which states that "[n]o person shall knowingly * * * cause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."[1]  He claims there is insufficient evidence to support these convictions because there is no evidence that Woods acted

---

[1] Woods was also convicted of one count of felonious assault in violation of R.C. 2903.11(A)(1), which states that "[n]o person shall knowingly * * * [c]ause serious physical harm to another[.]"  Cole was the named victim of this offense, and Woods does not challenge the sufficiency of the evidence as to this conviction.

knowingly because the Trailblazer's windows were tinted, and Woods could not have seen if there were any passengers inside. However, the evidence shows that Woods and his associates were waiting for the vehicle to arrive and confronted the occupants of the vehicle upon its arrival. The passenger-side window was open and the front-seat passenger can be clearly seen in the surveillance video. The surveillance video also shows that Woods knowingly fired his gun at the occupants of the vehicle and, therefore, knowingly caused or attempted to cause physical harm to each of the four occupants of the car.

### 7. Discharge of a Firearm Over Roadway

{¶ 107} Woods was charged with discharge of a firearm on or near prohibited premises in violation of R.C. 2923.162(A)(3), which provides that "[n]o person shall * * * [d]ischarge a firearm upon or over a public road or highway." Woods argues there is no evidence that he fired any shots at the corner of East 161st Street and Harvard Avenue. However, surveillance camera footage taken from a home on Harvard Avenue shows Woods and his unknown associate fire gunshots at a passing vehicle. A muzzle flash can be seen in Woods's gun as he is holding it up to shoot. Therefore, there is sufficient evidence to support this conviction.

{¶ 108} The eighth and ninth assignments of error are overruled.

### I. Ineffective Assistance of Counsel

{¶ 109} In the tenth assignment of error, Woods argues his trial counsel was ineffective and that his Sixth Amendment right to counsel was violated. He claims his trial counsel prejudiced him by (1) opening the door to his alleged gang

affiliation, (2) failing to file a motion in limine to prevent any mention of gang affiliation, (3) failing to use a peremptory challenge to remove juror No. 19, (4) failing to challenge the qualifications of the state's ballistics expert, and (5) failing to challenge the reliability of the ballistics testing methodology.

{¶ 110} To establish ineffective assistance of counsel, the defendant must demonstrate that counsel's performance fell below an objective standard of reasonable representation and that he or she was prejudiced by that deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Prejudice is established when the defendant demonstrates "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

### 1. Gang Affiliation

{¶ 111} Detective Zone testified that he knew Woods before any of the events giving rise to this case occurred because he and his associates congregated at the BP gas station at the intersection of Lee Road and Harvard Avenue where Detective Zone worked. On cross-examination, defense counsel asked Detective Zone about other groups or individuals, including gangs, who also frequented the BP gas station. Defense counsel was attempting to show that other individuals congregated at the BP gas station besides Woods. It was a legitimate attempt to discredit Detective Zone.

{¶ 112} However, even if the questions were not legitimate and counsel's performance was deficient, there is no evidence that Woods was prejudiced by them.

Indeed, there was no evidence that Woods was a member of any particular gang. Moreover, the outcome of the case turned on whether the jury believed the witnesses who identified Woods as the perpetrator of the crimes alleged in the indictments. The witnesses' identification testimony was corroborated with surveillance videos showing Woods committing the alleged acts. Moreover, defense counsel opposed a Evid.R. 404(B) motion filed by the state, arguing that the other acts evidence the state sought to introduce was unfairly prejudicial because it could potentially associate Woods with a criminal gang. Therefore, although defense counsel did not file a motion in limine to preclude evidence of gang affiliation, it opposed the introduction of that evidence in its response brief. Therefore, we cannot say that Woods was prejudiced by defense counsel's questions regarding neighborhood gangs.

### 2. Juror No. 19

{¶ 113} Woods argues his trial counsel was ineffective for failing to use a preemptory challenge to excuse juror No. 19, who was ultimately impaneled as juror No. 1.

{¶ 114} A trial attorney's decision regarding the use of a peremptory challenge is a matter of trial strategy. *State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 263-264. The Supreme Court of Ohio has "consistently declined to 'second-guess trial strategy decisions' or impose 'hindsight views about how current counsel might have voir dired the jury differently.'" *State v. Mundt*, 115

Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 63, quoting *State v. Mason*, 82 Ohio St.3d 144, 157, 694 N.E.2d 932 (1988).

{¶ 115} We need not second-guess counsel's trial strategy because there is no evidence that Woods was prejudiced by the juror's presence on the jury. As previously explained in our discussion of the fourth assignment of error, juror No. 19 indicated that she could be fair and impartial. Although juror No. 19 indicated she was opposed to guns, she also stated that her husband and son own guns, that she could follow the law, and that she could hold the government to its burden of proof. (Tr. 182, 185, and 187.) She also stated that she would be "open to applying the law to the facts" and that she could listen to the evidence "objectively." (Tr. 180, 188.) Therefore, Woods cannot demonstrate that he was prejudiced by counsel's decision not to use a peremptory challenge to remove juror No. 19.

### 3. Ballistics Evidence

{¶ 116} Woods argues his trial counsel was ineffective because they failed to object to the qualifications of the state's ballistics expert and to the reliability of the testing methods used by the expert. However, as previously explained in the sixth and seventh assignments of error, the state's ballistics expert had personal knowledge of the ballistics testing that was done in this case and was, therefore, qualified to testify regarding the testing in his own right. The reliability of the ballistics testing methodology has also been upheld in courts throughout Ohio as reliable. (*See* discussion of the seventh assignment of error.). Therefore, even if

counsel had objected to the ballistics expert or his testing methods, the objections would have been properly overruled.

{¶ 117} Therefore, the tenth assignment of error is overruled.

## J. Age as a Sentencing Factor

{¶ 118} In the eleventh assignment of error, Woods argues his sentence is excessive and violates the Eighth Amendment to the United States Constitution because the trial court did not consider his young age as a sentencing factor. However, Woods did not object to his sentence on constitutional grounds in the trial court. "[T]he constitutionality of a statute must generally be raised at the first opportunity and, in a criminal prosecution, this means in the trial court." *State v. Awan*, 22 Ohio St.3d 120, 122, 489 N.E.2d 277 (1986). Therefore, Woods's failure to raise the constitutionality of his sentence in the trial-court level generally constitutes waiver of that issue. *Awan* at 122.

{¶ 119} The waiver doctrine stated in *Awan* is discretionary, and an appellate court may review claims of defects affecting substantial rights for plain error, even though the appellant failed to bring such claims to the attention of the trial court. *In re M.D.*, 38 Ohio St.3d 149, 151, 527 N.E.2d 286 (1988); Crim.R. 52(B). As previously stated, to prevail under a plain-error analysis, the appellant bears the burden of demonstrating that, but for the error, the outcome of the trial would clearly have been different. *Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306, at ¶ 17.

{¶ 120} The Eighth Amendment to the United States Constitution, which applies to the states through the Fourteenth Amendment, provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." Article I, Section 9 of the Ohio Constitution similarly provides: "Excessive bail shall not be required; nor excessive fines imposed; nor cruel and unusual punishments inflicted."

{¶ 121} To constitute cruel and unusual punishment, "'the penalty must be so greatly disproportionate to the offense as to shock the sense of justice of the community.'" *State v. Anderson*, 151 Ohio St.3d 212, 2017-Ohio-5656, 87 N.E.3d 1203, ¶ 27, quoting *McDougle v. Maxwell*, 1 Ohio St.2d 68, 70, 203 N.E.2d 334 (1964). Ordinarily, if a sentence falls within the terms of a valid statute, it cannot constitute cruel and unusual punishment. *See State v. Johnson*, 8th Dist. Cuyahoga No. 80436, 2002-Ohio-7057, ¶ 119, citing *McDougle*, 1 Ohio St.2d at 69, 203 N.E.2d 334, and *State v. Juliano*, 24 Ohio St.2d 117, 120, 265 N.E.2d 290 (1970).

{¶ 122} However, in *State v. Long*, 138 Ohio St.3d 478, 2014-Ohio-849, 8 N.E.3d 890, the Ohio Supreme Court held that a court imposing a sentence on a juvenile for aggravated murder under R.C. 2929.03(A), "must separately consider the youth of a juvenile offender as a mitigating factor before imposing a sentence of life without parole." *Id.* at paragraph one of the syllabus, citing *Miller v. Alabama*, 567 U.S. 460, 473, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012). In *State v. Patrick*, 164 Ohio St.3d 309, 2020-Ohio-6803, 172 N.E.3d 952, the court extended the holding

of *Long* to juvenile offenders who are sentenced to life imprisonment with parole eligibility pursuant to R.C. 2929.03.

{¶ 123} The state claims that Woods was sentenced under R.C. 2929.02(A), and that the juveniles in *Patrick* and *Long* were sentenced under R.C. 2929.03. The state further asserts that because Woods has not cited any case law that extends the holdings in *Long* and *Patrick* to sentences imposed on a juvenile for aggravated murder under R.C. 2929.02(A), we should distinguish this case from those cases.

{¶ 124} R.C. 2929.02(A) provides:

> Whoever is convicted of or pleads guilty to aggravated murder in violation of section 2903.01 of the Revised Code shall suffer death or be imprisoned for life, as determined pursuant to sections 2929.022, 2929.03, and 2929.04 of the Revised Code, except that no person who raises the matter of age pursuant to section 2929.023 of the Revised Code and who is not found to have been eighteen years of age or older at the time of the commission of the offense * * * shall suffer death.

Thus, R.C. 2929.02(A) includes age as a mitigating factor and prohibits the court from imposing the death penalty on a juvenile offender. R.C. 2929.03 provides that if the indictment charging aggravated murder does not contain specifications of certain aggravating circumstances, then the court must impose life imprisonment without parole. However, R.C. 2929.03(H) provides the following exception for juvenile offenders:

> A court shall not impose a sentence of life imprisonment without parole on a person under division (A)(1) or (2), (C)(1) or (2), (D)(2) or (3), or (E)(1) or (2) of this section for an offense that was committed when the person was under eighteen years of age.

Thus, despite the state's argument to the contrary, R.C. 2929.02 and 2929.03 are not mutually exclusive; they both apply when sentencing juvenile offenders convicted of aggravated murder.

{¶ 125} The trial court did not consider Woods's age in open court and on the record when it sentenced him to life in prison with parole eligibility after 63 and a half years. (Tr. 1763.) This omission constitutes an error under *Patrick* and *Long*. Moreover, the failure to comply with applicable sentencing statutes is contrary to law and constitutes plain error. *State v. Banks*, 8th Dist. Cuyahoga No. 112735, 2023-Ohio-4655, ¶ 14, fn.1, citing *State v. Ayers*, 10th Dist. Franklin No. 13AP-371, 2014-Ohio-276, ¶ 15 (failure to make statutory sentencing findings constitutes plain error.).

{¶ 126} The trial court committed plain error by failing to consider Woods's age prior to imposing sentence. We, therefore, sustain the eleventh assignment of error.

## K. Cumulative Error

{¶ 127} In the twelfth assignment of error, Woods argues his right to fair trial guaranteed by the Fifth, Sixth, and Fourteenth Amendment to the United States Constitution was violated because of cumulative errors that occurred during the trial.

{¶ 128} Under the cumulative-error doctrine, a conviction may be reversed when the cumulative effect of nonprejudicial errors "deprives a defendant of a fair trial even though each of the instances of trial-court error does not individually

constitute cause for reversal." *State v. Garrett*, 171 Ohio St.3d 139, 2022-Ohio-4218, 216 N.E.3d 569, ¶ 270, citing *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223; *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus.

{¶ 129} "However, the doctrine of cumulative error is inapplicable when the alleged errors are found to be harmless or nonexistent." *State v. Allen*, 8th Dist. Cuyahoga No. 102395, 2016-Ohio-102, ¶ 53, citing *State v. Brown*, 100 Ohio St.3d. 51, 2003-Ohio-5059, 796 N.E.2d 506, ¶ 48. Woods raised ten assignments of error claiming that multiple errors occurred at trial. And yet, we found none. Woods also does not provide any specific argument as to how the cumulative effect of the alleged errors deprived him of a fair trial. He merely reiterates the list of errors argued in his separate assignments of error. The Ohio Supreme Court has held that where an appellant "offers no further analysis" except to claim that the cumulative error deprived him of a fair trial, the appellant's argument "lacks substance." *State v. Madison*, 160 Ohio St.3d 232, 2020-Ohio-3735, 155 N.E.3d 867, ¶ 210.

{¶ 130} Woods received a fair trial. We, therefore, overrule the twelfth assignment of error.

{¶ 131} The trial court's judgment is affirmed in part and vacated in part. Woods's convictions are affirmed but his sentence is vacated, and the case is remanded to the trial court to allow the court to consider Woods's age in resentencing.

It is ordered that appellee and appellant share costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, PRESIDING JUDGE

MARY J. BOYLE, J., and
FRANK DANIEL CELEBREZZE, III, J., CONCUR