[Cite as *State v. Gaines*, 2024-Ohio-1275.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

STATE OF OHIO,                              :

    Plaintiff-Appellee,               :

                                                                      No.  112701

    v.                                          :

ASHLEY GAINES,                          :

    Defendant-Appellant.           :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:**  AFFIRMED
**RELEASED AND JOURNALIZED:**  April 4, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-22-666719-B

---

*Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Halie Turigliatti, Assistant Prosecuting Attorney, *for appellee*.

Gregory T. Stralka, *for appellant*.

EMANUELLA D. GROVES, J.:

{¶ 1} Defendant-appellant Ashley Gaines ("Gaines") appeals her convictions for felonious assault.  For the reasons that follow, we affirm.

## Procedural and Factual History

**Statement of Facts**

{¶ 2} Gaines and Allison Fadel ("Fadel"), who are sisters, were indicted on February 22, 2022, on two counts of felonious assault, second-degree felonies, in violation of R.C. 2903.11(A). The charges stemmed from a fight on November 7, 2021, involving Gaines, Fadel, Sheena Walcott ("Sheena"), and Shawnee Walcott ("Shawnee") (collectively "Walcott sisters"). Gaines and Fadel pled not guilty, and after several pretrials, the matters were set for a joint trial.

{¶ 3} During discovery, the state obtained a search warrant for an Instagram page purportedly linked to Fadel. The state intended to introduce 35 pages from the warrant return of over ten thousand pages. Gaines objected to the introduction of Fadel's Instagram pages because they were not authenticated.

{¶ 4} The jury trial commenced on April 4, 2023. The testimony revealed the following undisputed facts. In the early hours of November 7, 2021, the Walcott sisters attended a birthday party at the Ken Ferguson Party Center in Cleveland, Ohio. They drove separately but walked into the party together at approximately 1:00 a.m. Once inside the party center, they noticed Fadel and Gaines were at the back of the room. Shawnee was off to the side, and Sheena was dancing in the middle of the dance floor.

{¶ 5} The state offered two versions of the same video into evidence. (Tr. 7.) The first depicted Gaines on top of Shawnee, who was on the ground, hitting her several times on her face. Sheena was also on the ground in the video, and Fadel

was standing up.  The video was approximately 12 seconds long.   The other video was a copy of the first, but in slow motion.

{¶ 6}   At trial, the state called Shawnee and Sheena Walcott and Detective Timothy Hannon.  Both codefendants, Gaines and Fadel, testified on their own behalf.  Each of the women testified to the following versions of the disputed facts concerning the altercation.

**Shawnee Walcott**

{¶ 7}   Shawnee described her relationship with Gaines as, "So I have no relationship. I seen her a few times." (Tr. 438.)  Shawnee met Gaines through her sister Sheena, but they had never conversed.  Prior to the fight, she sent an Instagram message to Gaines canceling a massage appointment.  Gaines did not respond to that message.  Shawnee testified that on September 18, 2021, she attended a party with Fadel.  She described Gaines' reaction to seeing her as "[Gaines] lit up when she seen me and my sister." (Tr. 465.)  This was the first time she had seen Gaines up close, and the extent of their interaction was Shawnee complimenting Gaines' outfit with no response from Gaines.  Gaines never spoke a word to Shawnee, including the night of the altercation.

> Okay.  And now on this particular day having had no prior incidents with you, she comes out of nowhere and starts beating you up?
>
> SHAWNEE:  No.  They bullied us prior.
>
> Q:  You said you never had words with my client, Ashley Gaines, so let's talk about Ashley Gaines.
>
> SHAWNEE:  Yes, I'm talking about her.

Q: She's never had words with you, correct, per your testimony or is that not your testimony now?

SHAWNEE: Yes, that is my testimony.

Q: All right. So she's never had words with you, including the date of this incident —

SHAWNEE: Correct.

Q: — Correct? But this day, without words ever, she just attacked you for no reason, is that your testimony?

SHAWNEE: Yes. * * *

(Tr. 464.)

{¶ 8} Despite Gaines never speaking to her, Shawnee felt she had to steer clear of Gaines and Fadel due to bullying. She stated:

A: We stayed clear because they were — me and my sister, Shawnee, stayed clear of Allison and Ashley because they were bullying us in the flesh.

(Tr. 358.)

{¶ 9} Shawnee described the moments leading up to the fight. She saw Fadel and Gaines "move in" toward them. Fadel and Gaines proceeded from the back of the room to the dance floor, with Fadel heading towards where Sheena was dancing and Gaines moving toward Shawnee. Fadel began dancing in a "disrespectful" manner and pointing at Sheena as she moved toward her. Shawnee testified that Gaines approached her from behind. (Tr. 389-390.) As Shawnee watched Fadel move toward Sheena, she felt contact on the right side of her face. Shawnee said that she realized Gaines was assaulting her after the first hit. (Tr. 393.)

Shawnee explained that Gaines hit her with "a tool." Shawnee did not see a tool but said the next morning, "I actually had the taste of whatever she had on her hand in my mouth." (Tr. 396.)

> Q: Okay. And were you able to see anything in her hand during this altercation?
>
> A: No, because I was unconscious. My right eye, after everything, it was almost swollen shut because she kept hitting me in it over and over.

(Tr. 395.) Shawnee stated that she lost consciousness right away and was not even aware that she was on the ground until she saw the video. (Tr. 397-398.)

> Q: So, would you say you kind of started to lose consciousness after how many hits?
>
> SHAWNEE: Right away. I didn't even know where I was. I had an out-of-body experience. I couldn't figure out why can't I defend myself better. I know size doesn't matter, but there's no way it would have been a complete blowout like that. I knew I couldn't do anything.

(Tr. 396.)

\* \* \*

> Q: Okay. I want to address the cut on your left leg. Now, do you recall every moment of this fight?
>
> SHAWNEE: I was unconscious the whole time, like, right away, so there's, like — it was, like, flashing before my eyes.

(Tr. 466.)

{¶ 10} All of the blows were to the right side of Shawnee's face, and Gaines targeted her right temple. (Tr. 400.) At some point, Gaines sliced Shawnee's leg with some sort of tool, chipped her teeth, and stomped her pelvis. After the first

blow, Shawnee was unconscious throughout the rest of the altercation. (Tr. 392-393.)

{¶ 11} When asked about her sister's fight, Shawnee testified that she did not see it and was not even aware Sheena was fighting when it was happening. (Tr. 401.) Shawnee never saw Fadel during the entire altercation, which she said lasted for six to eight minutes. On November 17, 2021, she received an anonymous text message with a video depicting twelve seconds of the fight. Shawnee forwarded the video to Sheena and then deleted it from her phone. Shawnee did not provide the video nor the sender's phone number to the police before she deleted it.

**Ashley Gaines**

{¶ 12} Gaines testified that she sometimes saw Shawnee and Sheena at parties but never interacted with them. The evening of the fight, Gaines was on the dance floor when she observed a commotion. (Tr. 567.) She looked for her sister and quickly realized Fadel was fighting. As she tried to get to Fadel, Shawnee grabbed her hair, and the two began fighting. They fell to the floor and exchanged kicks as a man pulled Gaines off of Shawnee. According to Gaines, the fight lasted less than a minute, and she and Fadel remained at the party after the altercation.

**Sheena Walcott**

{¶ 13} Sheena testified that she noticed Fadel and Gaines at the back of the party center. Later, she saw Fadel walk up to the dance floor but had no idea where Gaines was at that time. As she was walking away, Fadel hit her from behind in her left eye and several times on the left side of her face. The medical records indicated

that Sheena believed she was hit by fists and no weapons were involved. She was diagnosed with a broken orbital bone and nose and post-concussion syndrome. (State's exhibit No. 3.)

**Allison Fadel**

{¶ 14} Fadel testified that she is a performer/dancer in the local Caribbean music scene. She met the Walcott sisters while performing. Fadel and the Walcott sisters became friends, and they would sometimes perform together. Their friendship ended a few months before the altercation. On October 22, 2021, Sheena pushed Fadel over while she was balancing on her head, and she broke her wrist. Fadel was still in a cast the night of the altercation.

{¶ 15} On the night of the fight, Fadel arrived at the party center around 11:30 p.m. She was supposed to perform at the party but had to withdraw after breaking her wrist. Fadel testified that she was not aware that the Walcott sisters were at the party until she was pushed by Sheena on the dance floor, poked in her face multiple times, and then "yoked her up." (Tr. 547, 551.) When Fadel pushed her off, Shawnee punched Fadel. At that point, Fadel was fighting both of the Walcott sisters until "one was pulled off and Sheena was left." (Tr. 535-536.) The state questioned Fadel about a message she sent to someone on Instagram where she described what happened.

> Q: Okay. So you're saying — this is on page 196 of Exhibit 1-A — that she kept fucking with me and walking past me and then she pushed my shoulder, so I told her not to be playing with me because I will beat your ass tonight and she put her finger in my face, so I choked her and I saw her sister coming out of the corner of my eyes so I punched her. Carried

on to say, I beat the one I was already choking. So you're saying that your talk-to-text just corrected Chuck to choking twice?

FADEL: Autocorrect.

(Tr. 553.) Fadel testified that Sheena started the fight and that she was fighting both Walcott sisters before Gaines intervened.

**Detective Timothy Hannon**

{¶ 16} Detective Hannon testified that Detective Nykolai Przybylaski was the original detective on the case, but he retired. Detective Hannon read several pages into the record from state's exhibit No. 1, which consisted of 10,000 pages of Fadel's Instagram messages that were returned in response to a search warrant. Detective Hannon explained that he had received a call from the prosecutor's office less than a week before, asking him to handle the case because they had no one to testify. Detective Hannon reviewed the file but did not have time to investigate or interview anyone concerning the case. (Tr. 499.)

{¶ 17} Gaines and Fadel were both found guilty of two counts of felonious assault, felonies of the second degree, in violation of R.C. 2903.11(A)(1). The trial court imposed a sentence of four to six years in prison on both Gaines and Fadel on April 27, 2023.

{¶ 18} Gaines raises the following assignments of error on appeal:

<u>**Assignment of Error No. 1**</u>

The trial court erred by admitting into evidence, over objection, altered electronic media of the alleged incident without sufficient foundation.

## Assignment of Error No. 2

The appellant's constitutional right to effective assistance of counsel was violated when such counsel failed to object to inadmissible evidence.

## Assignment of Error No. 3

The jury's verdict finding the appellant guilty of felonious assault in Count 1 of the indictment is against the manifest weight of the evidence since the appellant had no contact with the alleged victim.

## Law and Analysis

{¶ 19} In her first assignment of error, Gaines challenges the admissibility of Instagram messages, purportedly from Fadel's account, and two videos depicting twelve seconds of the fight. Gaines argues that the Instagram messages impermissibly incriminated her in violation of the Confrontation Clause. Additionally, Gaines asserts that the Instagram messages and two videos were not properly authenticated.

{¶ 20} The admission or exclusion of evidence is within the sound discretion of the trial court and will not be reversed absent an abuse of discretion. *State v. Holland*, 8th Dist. Cuyahoga No. 109416, 2021-Ohio-705, ¶ 21, citing *State v. Hymore*, 9 Ohio St.2d 122, 224 N.E.2d 126 (1967). Furthermore, this abuse of discretion must have materially prejudiced the defendant. *State v. Heard,* 8th Dist. Cuyahoga No. 110722, 2022-Ohio-2266, ¶ 29.

{¶ 21} The authentication of evidence is a prerequisite to its admissibility. *State v. Woods*, 8th Dist. Cuyahoga Nos. 112579 and 112580, 2024-Ohio-467, ¶ 3, citing Evid.R. 901(A). The proponent of the evidence must offer sufficient evidence

that the matter is what it claims to be.  However, conclusive proof is not required.
*Id.*

{¶ 22} Gaines argues that the Instagram messages are not admissible for two reasons.  First, Gaines claims that the messages were allegedly written by Fadel and incriminated Gaines in violation of the *Bruton* rule.  The rule establishes procedures for handling inculpatory statements made by codefendants in a joint jury trial.  *See Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

{¶ 23} In *Bruton,* the United States Supreme Court held that in a joint jury trial, confessions made by a codefendant who does not testify are inadmissible against the other defendant because that defendant has no opportunity to cross-examine the confessing codefendant.  *State v. Cassano*, 8th Dist. Cuyahoga No. 97228, 2012-Ohio-4047, ¶ 30, citing *Bruton* at 123.

{¶ 24} However, the *Bruton* rule is not applicable unless the codefendant who made the admissions exercises their constitutional right not to testify, and indirect references are cured by a limiting instruction to the jury.  *Cassano* at ¶ 30. *See Samia v. United States*, 599 U.S. 635, 143 S.Ct. 2004, 216 L.Ed.2d 597 (2023) (indirect references to the defendant are permissible as long as the jury is properly instructed not to consider them against the nonconfessing defendant).  Conversely, when a codefendant does testify, the defendant has an opportunity to cross-examine them, so *Bruton* is not implicated, and a limiting instruction is not necessary.  *Id*. At trial, Fadel testified, and Gaines was afforded an opportunity to cross-examine her.  Therefore, the *Bruton* rule was not implicated, and a limiting instruction to the

jury was unwarranted. Accordingly, the *Bruton* rule is inapplicable to the Instagram messages.

{¶ 25} Gaines' second challenge to the admissibility of the Instagram messages alleges that the messages were not authenticated. The state asserts that the messages were self-authenticated. The admissibility of evidence by self-authentication is governed by Evid.R. 902. Domestic business records that are kept in the ordinary course of business may be authenticated by a certification of the custodian or another qualified person pursuant to Evid.R. 902(11). "Extrinsic evidence of authenticity as a condition precedent to admissibility is not required" for records accompanied by a certificate of acknowledgment executed in the manner provided by Evid.R. 902. *State v. Miller*, 173 Ohio St.3d 102, 2023-Ohio-3448, ¶ 57. The certification must affirm that the records were made at or near the time by, or from information transmitted by, a person with knowledge that the records are kept in the course of a regularly conducted business activity and that it was the regular practice of that business activity to make the record. Evid.R. 803.

{¶ 26} In the instant case, the messages were obtained by search warrant from the social media company Meta and included a written certification page. The statements in the messages implicated both Fadel and Gaines in the assaults. Moreover, the messages were self-authenticating because the certification was from the custodian of the records; the records were kept in the regular course of its business; made by someone with knowledge of the records and made at or near the time the messages were created. Accordingly, the trial court did not abuse its

discretion when it determined that the Instagram messages were properly authenticated.

{¶ 27} Additionally, Gaines argues that the videos of the altercation were inadmissible because they were not authenticated. It is undisputed that the videos were not self-authenticating. When demonstrative evidence is not self-authenticating, the proponent of video or photographic evidence may authenticate the evidence by witness testimony only if the witness has knowledge that "the matter is what it claims to be." *State v. Paster,* 2014-Ohio-3231, 15 N.E.3d 1252, ¶ 32 (8th Dist.).

{¶ 28} There are generally two methods of authenticating this type of evidence. *State v. Anderson*, 8th Dist. Cuyahoga No. 100090, 2014-Ohio-1831, ¶ 13. The first is "the silent witness theory." *Id.*, citing *Midland Steel Prods. Co. v. Internatl. Union, United Auto., Aerospace & Agricultural Implement Workers, Local 486,* 61 Ohio St.3d 121, 573 N.E.2d 98 (1991). Under this theory, the evidence speaks for itself; therefore, an independent sponsoring witness is not necessary. *Id.* The evidence is admissible if there is sufficient proof of the reliability of the process or system that produced the evidence. *Id.* at ¶ 14. Shawnee testified that an anonymous source sent the video to her; she sent it to her sister and then deleted it from her phone. She could offer no evidence concerning the reliability of the process or explain who recorded the video. In this case, the videos could not be authenticated under the silent witness theory. However, the videos could be

admissible to corroborate witness testimony under the second theory of authenticating demonstrative evidence.

{¶ 29} The second theory of authenticating demonstrative evidence is the "pictorial testimony theory." *Heard*, 8th Dist. Cuyahoga No. 110722, 2022-Ohio-2266, at ¶ 32. Authentication under this theory involves testimony from a person who was present during the events and observed what is depicted or someone who filmed the image, authenticating the images or what the images depict at trial. *Id.* Under this theory, the evidence is admissible only if a sponsoring witness can testify that it is a fair and accurate representation of the subject matter based on that witness's personal observation. *State v. Arafat*, 8th Dist. Cuyahoga No. 85847, 2006-Ohio-1722, ¶ 153; s*ee Midland Steel Prods. Co.* at 121.

{¶ 30} In the instant case, neither Shawnee nor Sheena knew the anonymous source of the video. Shawnee deleted the phone number that sent it. Additionally, Shawnee could not testify that the video depicted what occurred during the altercation because she testified that she was unconscious after the first blow. Shawnee only became aware that she had been on the ground during the altercation after she saw the video. Moreover, she could not say whether the original video had been altered.

{¶ 31} The state admitted that the second video was altered to render a slow-motion version of the first video. Although Shawnee identified herself in the videos, she could not say that the videos depicted an accurate representation of what happened. Therefore, neither video could be authenticated. The trial court abused

its discretion when it admitted the two videos depicting twelve seconds of the altercation.

{¶ 32} A trial court's abuse of discretion must materially prejudice the defendant to warrant a reversal. *Heard*, 8th Dist. Cuyahoga No. 110722, 2022-Ohio-2266, at ¶ 29, citing *State v. Lowe*, 69 Ohio St.3d 527, 634 N.E.2d 616 (1994), citing *State v. Maurer*, 15 Ohio St.3d 239, 473 N.E.2d 768 (1984). Gaines, Fadel, and the Walcott sisters all testified that the video did not depict the entire fight. Each of them offered a version of what took place. Gaines said the video accurately depicted the end of the fight. Gaines was on the ground with Shawnee grabbing her hair. Gaines explained to the jury her version of what took place during the altercation, and the jury was free to weigh the credibility of all of the witnesses. Therefore, we cannot say that the video was materially prejudicial.

{¶ 33} Accordingly, the trial court's admission of the video was a harmless error. Gaines' first assignment of error is overruled.

**Ineffective Assistance of Counsel**

{¶ 34} Gaines argues in her second assignment of error that her trial counsel was ineffective because they failed to object to inadmissible evidence. However, Gaines' argument is not supported by the record.

{¶ 35} The test for establishing an ineffective assistance of counsel claim is two-pronged. To succeed, Gaines must establish that 1) her counsel's performance was deficient and (2) the deficient performance prejudiced her so as to deprive Gaines of a fair trial. *See State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911

N.E.2d 242, ¶ 98, citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  "The failure to prove either prong of this two-part test makes it unnecessary for a court to consider the other prong."  *State v. Madrigal*, 87 Ohio St.3d 378, 721 N.E.2d 52 (2000).

{¶ 36} Gaines claims her counsel's performance was deficient because they failed to object or request a limiting instruction once the trial court permitted the state to introduce statements in violation of the *Bruton* rule.  Gaines argues that statements made by Fadel in Instagram messages indirectly referenced her and triggered the *Bruton* rule.  Gaines' name was redacted, but the messages included language such as: "us," "we," "my sister," and "our."

{¶ 37} The state sought to introduce several of these messages as admissions of a party opponent under Evid.R. 801(D).

> THE COURT:  You mention the Bruton issue —
>
> STATE:  Correct.
>
> THE COURT:  — Statements made by Miss Fadel and Miss Gaines regarding the other Defendant —
>
> STATE:  Yes.
>
> THE COURT:  — Implicating the other Defendant?
>
> STATE:  There are a few statements from Miss Fadel saying I'm the one in the back and my sister, Miss Gaines, is the one in the front.  I've taken those out of the portions that I used for direct examination, obviously.  If they're going to testify, that's open for cross-examination, and I would use the additional statements at that time.
>
> THE COURT:  All right.  So you've redacted the implicating statements by the Defendant of the other Defendant?

STATE:  Correct.

(Tr. 248-249.)  After substantial discussion, the trial court issued rulings regarding the admissibility and exclusion of several exhibits, and trial counsel did not object to the admissibility of any exhibits on "*Bruton* grounds."  Nonetheless, the trial court addressed the exhibits that contained potential *Bruton* implications.  Furthermore, Fadel's decision to testify rendered the *Bruton* issue moot.

{¶ 38} Gaines also claims her trial counsel's performance was deficient because they failed to object to the admissibility of two videos.  However, the record demonstrates the trial counsel's objection.  Regarding the videos, trial counsel stated:

> I concur, your Honor.  We object to the admission of the video. Everyone has testified that it's not a full and accurate depiction of what happened that evening.  It's amazing it only covers the part where our client had an advantage.  It doesn't show how it started or why it started, or anything of that nature.

(Tr. 584.)

{¶ 39} As addressed in the first assignment of error, the trial court erred when it admitted the videos.  However, Gaines has failed to demonstrate that her counsel's performance was deficient because they did, in fact, object to the admissibility of the videos.  Therefore, we need not address the second prong. Accordingly, Gaines' second assignment of error is overruled.

**Manifest Weight**

{¶ 40} In her third assignment of error, Gaines argues the conviction of felonious assault of Sheena Walcott is against the manifest weight of the evidence because she had no contact with Sheena during the altercation. A manifest weight challenge requires the reviewing court to sit as the "thirteenth juror" and to consider the entire record. If, after weighing the credibility of the evidence and resolving any conflicts, the reviewing court finds that the trier of fact lost its way, the verdict is against the manifest weight of the evidence and must be reversed. *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). A reversal of a conviction, based on a manifest weight challenge, must only happen in those exceptional cases where the evidence weighs heavily against the conviction. *State v. Martin,* 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983).

{¶ 41} Although it is undisputed that Gaines made no physical contact with Sheena, the conviction of felonious assault as it relates to Sheena Walcott was based on complicity in violation of R.C. 2923.03(F). A person aids and abets another when she supports, assists, encourages, cooperates with, advises, or incites the principal in the commission of the crime and shares the criminal intent of the principal. *State v. Johnson*, 93 Ohio St.3d 240, 754 N.E.2d 796 (2001). *State v. Hubbard*, 8th Dist. Cuyahoga No. 83389, 2004-Ohio-5204, ¶ 40. It is well established that criminal intent may be inferred from presence, companionship, and conduct before and after the offense is committed. *Id*.

{¶ 42} Here, the trier of fact heard four very different versions of what occurred leading up to and during the altercation. The jury was free to believe all, none, or some of the evidence presented. We cannot say that the record lacks competent and credible evidence to support Gaines' guilty verdict of complicity in committing felonious assault on Sheena Walcott. After careful consideration of all of the evidence in the record, making reasonable inferences from it, and resolving conflicts in the evidence, we cannot say the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387.

{¶ 43} Judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EMANUELLA D. GROVES, JUDGE

MARY EILEEN KILBANE, P.J., CONCURS;
LISA B. FORBES, J., CONCURS WITH THE MAJORITY ON ASSIGNMENTS OF
ERROR NOS. 2 AND 3 AND CONCURS IN JUDGMENT ONLY ON ASSIGMENT
OF ERROR NO. 1