[Cite as *State v. Bachtel*, 2024-Ohio-2014.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
OTTAWA COUNTY

State of Ohio                                    Court of Appeals No.  OT-23-006

      Appellee                                    Trial Court No.  22 CR 027

v.

Brian S. Bachtel                                 **DECISION AND JUDGMENT**

      Appellant                                   Decided:  May 24, 2024

* * * * *

James J. VanEerten, Ottawa County Prosecuting Attorney, and
Thomas A. Matuszak, Assistant Prosecuting Attorney, for appellee.

Joseph Sobecki, for appellant.

* * * * *

**DUHART, J.**

**{¶ 1}** Appellant, Brian S. Bachtel, appeals from the judgment of the Ottawa County Court of Common Pleas convicting him of one count of sexual battery under R.C. 2907.03(A)(2) and one count of sexual battery under R.C. 2907.03(A)(3). For the reasons that follow, the trial court's judgment is affirmed.

## Statement of the Case

{¶ 2} On February 10, 2022, the Ottawa County grand jury returned a true-bill indictment, charging appellant with 12 felonies, stemming from six different incidents relating to the same victim ("L.M."). Counts One through Six charged appellant with sexual battery in violation of R.C. 2907.03(A)(2) and (B) (alleging that the victim was substantially impaired), each offense being a felony of the third degree (upper tier) and a Tier III sex offense; Counts Seven through Twelve charged appellant with sexual battery in violation of R.C. 2907.03(A)(3) and (B) (alleging that the victim was unaware), each offense being a felony of the third degree (upper tier) and a Tier III sex offense.

{¶ 3} A two-day jury trial was held in the matter on January 17-18, 2023. At the conclusion of the trial, the jury found appellant guilty of Counts One and Seven, and not guilty of the remaining 10 counts.

{¶ 4} At the sentencing hearing, held on March 9, 2023, the trial court imposed five-year prison terms for Counts One and Seven, respectively, with the sentences ordered to run concurrently, for a total of five years in prison. The trial court also ordered that appellant register as a Tier III sex offender.

{¶ 5} Appellant timely filed an appeal from his conviction.

2.

**Statement of the Facts**

**Pretrial Meeting with the Court**

{¶ 6} On January 17, 2023, just prior to commencement of appellant's trial on charges of sexual battery, the trial court and counsel for the parties discussed the propriety of giving jury instructions on the topic of consent:

> [THE PROSECUTOR]: Now, here's the rub, so to speak. * * * Based upon my research, **what I have found is that consent is not an affirmative defense**. So the Defendant does not bear any burden of proof. And consent is a complete defense to a charge of Rape by force or threat of force. I have found cases that say sexual battery by coercion is a lesser included offense of rape by force or threat of force. So, in theory, consent would apply to that charge. [Emphasis in original.]
>
> Those are not our charges. We have two types of sexual batteries. One involving substantial impairment and one involving the victim being unaware because she was passed out or medicated into sleep.
>
> I would propose an instruction I found from a case called <u>State versus Jones</u>, which is a Tenth District Court of Appeals case from 2017. * * * [T]he Court noted that * * * the Trial Court's explanation of the law with respect to consent and intoxication was a correct statement of the law. * * * The specific instruction that the Trial Court had given read as follows: A person does not and cannot consent to have sex with another if the person's ability to consent is substantially impaired because of a physical condition or intoxicant.
>
> I could find no case law whatsoever that dealt with the fact pattern we have here where the allegation is [the victim] consented while she was sober to something that would happen when she was substantially impaired or unaware. I think that's as close as we can come on an accurate statement of law for the jury instructions.

3.

Of course, that begs the question, how does one revoke consent when one is substantially impaired or unaware? That's the * * * twist here, and I don't have a legally correct answer for the Court.

[DEFENSE COUNSEL]: **At this point, I don't know that we should include it because I think it's, I think it could be prejudicial. I mean, it, it's – I don't need to confuse the jury.** * * * I think the four jury instructions that the State has proposed pretty much covers the elements and the, the basic issue. The issue of consent and can, can she retract consent, there's really – I mean, that's going to have to be for the jury to decide on the facts. I don't think that the law right now is, there is anything that can really point them in that direction. [Emphasis added.]

* * *

[THE PROSECUTOR]: Well, that brings us to State versus Dickerson, an Eight District case also from 2017. The dissent was authored by Judge Melody Stewart, now Justice Melody Stewart. * * * At Paragraph 73 she wrote in part, quote, first it completely ignores the fact that one cannot consent to sex if the person is substantially impaired due to intoxication, see, for example, In re King, Eighth District, Cuyahoga County, 2002-Ohio-2313 at Paragraphs 20 to 23.

She continues, second, the argument ignores the fact that consent, even if initially given can be revoked. Which is a correct statement of the law. Once [the victim] is substantially impaired, she cannot revoke consent. * * *

* * *

[DEFENSE COUNSEL]: Again, it's – that's a dissenting opinion. I mean, it, it's not a majority opinion. I mean, it's not really authority. * * * I think that the first four instructions that the State has proposed I think is, it covers what we can cover. **And I don't think adding anything else with respect, respect to rescinding consent or revoking consent, I don't think there's enough law for the jury to actually have a, a jury instruction to consider.** [Emphasis added.]

THE COURT: Nor, at this point, facts that point to any sort of rescission.

[THE PROSECUTOR]: Well, and that raises another issue, Your Honor. If the Court would agree with [defense counsel], would I draw an objection and would an objection be sustained in closing argument if I told the jury if consent was a valid defense it would be in the jury instructions, but it's not?

THE COURT: If consent were a valid defense.

[THE PROSECUTOR]: Then it would be in the jury instructions. But it's not.

THE COURT: [Defense counsel]?

[DEFENSE COUNSEL]: **I, I don't know that – I mean, that is something the State can certainly argue. Again, it's not the law and it's argument, so I don't, I don't think that there's anything inappropriate about that statement.** [Emphasis added.]

THE COURT: All right.

**Jury Selection**

{¶ 7} During jury selection, the state repeatedly reminded the prospective jurors that if they made the final cut, they would be bound by the trial court's jury instructions. At no point during jury selection did appellant's trial counsel object to the state's comments in that regard.

**Opening Statements**

{¶ 8} The state, during its opening statement, told the jury, "Now, at the end of the day, the Prosecution does not have to prove lack of consent." Appellant's trial counsel

did not object to this statement, but later, in his opening statement, offered as an "explanation" for appellant's behavior in this case that appellant and the victim had an agreement:

> As far as the sex itself, there was an agreement, you will hear. And [the prosecutor] classified it or categorized it as, as an admission. It's not an admission. It's an explanation. They had an agreement. And when she wore panties, that was the signal for him to have sex with her. When she wore her, her bed wear, her pajamas, then that was, no, I don't want sex.

**The State's Case-in-Chief**

**Clarissa Logan**

{¶ 9} Clarissa Logan was victim L.M.'s case manager at Choices Behavioral Healthcare. The victim became a client of Logan's in April 2021. Through this relationship Logan helped L.M. manage her coping skills for anxiety, depression, PTSD, and past trauma. During the period from April 2021 to the time of trial in this case, Logan had met with the victim at least 60 times. Logan testified that L.M. had a lot of medical issues in addition to her mental health issues, and that, as a result of all of these conditions, L.M. had a medication list that was three pages long.

{¶ 10} Logan testified that L.M. moved into an apartment with appellant sometime in the summer of 2021. Between September 2021 through January 2022, Logan did home visits where she determined that L.M.'s living conditions were fine. But in December 2021, L.M. disclosed an incident during which appellant threw a glass because L.M. refused to give him sex. The situation took a further turn on January 10, 2022, when L.M.

6.

disclosed to Logan that appellant had sexually abused her. On the same day, L.M. sent a picture to Logan's phone, which L.M. described as showing body fluids that were left on the her sheets the night before, following non-consensual sex with appellant.

{¶ 11} Logan is a mandatory reporter in Ohio, so following L.M.'s disclosure, she took L.M. to the police department where they met with a detective and another officer. The detective interviewed L.M. while Logan was outside in the waiting room.

{¶ 12} Afterwards, L.M.'s living situation changed. She stayed with a friend until her protection order was granted.

### L.M. Direct Exam

{¶ 13} The victim, L.M., was 61 years old at the time of trial. She testified on direct examination that she moved to Port Clinton in 2002 following a divorce from her ex-husband, who during the course of the marriage had raped both her and her daughter and, further, had pushed L.M. down some steps, breaking L.M.'s back. L.M. testified that she continued to struggle on a daily basis with PTSD that resulted from that trauma.

{¶ 14} L.M. stated that she had been seeing case manager Logan for about a year, and had seen another counselor, Julie Oliver, for over 20 years. L.M. confirmed Logan's role as L.M.'s client services provider.

{¶ 15} L.M. also confirmed that she was on medications to help her with her PTSD, anxiety, and depression. She stated that she takes pain pills (in part due to her back injury), and that her pain pills make her feel "real groggy and sleepy" and "knock[] her right out." Even without her medications, L.M. stated that she is normally a heavy

7.

sleeper, but once the medications are added in, "you can set a bomb off next to me and I'd never hear it." She stated that the effect of the pain medications lasts for about four or five hours before they finally wear off, and that she took those medications every night, seven days a week. L.M. testified that she told appellant, "[T]his medication knocks me out really heavy." In addition, she stated that appellant personally saw, on a regular basis, this effect that the medications had on her.

{¶ 16} L.M. and appellant had known one another for 10-15 years. They first met at the Giving Tree, which is a behavioral counseling center. Approximately two months later, the victim and appellant began a more serious relationship that eventually involved a sexual relationship. From that time forward, the two shared a long on-again-off-again relationship.

{¶ 17} In the summer of 2021, L.M. and appellant renewed their relationship once more, this time moving in together at the Perry's Glen apartments in Port Clinton. They had separate bedrooms, because "at the time [they] were considered just roommates." In spite of this arrangement, there were about four occasions during this time period when L.M. agreed to have vaginal sex with appellant, each time while she was wide awake and not under the influence of any medications.

{¶ 18} L.M. explained that sex was difficult for her and that "[b]ecause of her PTSD and the past, [she] really [didn't] care too much about sex." While L.M. and appellant were living together at Perry's Glen, appellant asked her to have sex with him about four or five times per week. Although L.M. consented to have vaginal sex with

appellant on several occasions, appellant asked her to have anal sex "[a]ll the time." Each and every time that appellant asked L.M. for anal sex, she responded "absolutely not." She told him this was because she did not like it. L.M. further denied ever telling appellant that he had her permission to have sex with her, whether vaginal or anal, while she was passed out on drugs at night.

{¶ 19} Eventually, L.M. began to realize that something was happening to her while she was drugged and asleep. She stated that the realization set in "[w]hen I would wake up and my underwear would be off of me, because I wear t-shirt and underwear to bed. Or I'd be leaking something from behind," specifically her anus. She testified that this had occurred four or five times.

{¶ 20} She asked appellant what was happening while she was asleep and passed out on her medications. Appellant admitted that he had been having anal sex with her. L.M. testified:

> I told him, why? I asked him why. And he couldn't give me
> an answer why. And I said, well, that's not right because I'm,
> you know, knocked out and I didn't know what was going on
> and I don't think that was right for him to do that.

{¶ 21} L.M. further testified that she had also woken up and had fluids leaking from her vagina on about two occasions, for a total of six to seven occasions of non-consensual sex while she was asleep. [1]

---

[1] After targeted cross-examination by appellant's counsel, L.M. concluded on redirect examination that the total number of times that appellant had sex with her while she was asleep and without her permission was, instead, five.

9.

**{¶ 22}** L.M. testified that on some occasions, she had woken up with her underwear still on, but nonetheless leaking bodily fluids. She also noticed damage to her underwear. L.M. stated that appellant "cut a slit in my underwear, a couple of them, so he could have access to, to my either vagina or my anal." L.M.'s friend, Sandra Thomas, saw the cuts in the underwear. According to L.M., Sandra "[s]aw them in the laundry. She was helping me with my laundry because I couldn't lift my laundry basket. * * * And when doing so, she saw my underwear, the two pairs of underwear that had the cut in it, and when she brought it back she asked me what it was."

**{¶ 23}** L.M. testified that had she woken up while appellant was having sex with her, she would have told him to stop.

**{¶ 24}** Describing what prompted her to disclose to Logan what was happening, L.M. stated, "We went to lunch one day and he had anal sex with me, and I was leaking all that day, that morning, that afternoon. And I decided that it needed to stop, so I persisted to tell [Logan] what was going on." Afterwards, they went straight to the police station where L.M. was interviewed by Detective Corbin Carpenter and Officer Curt Cochran. The victim testified that everything she had told Carpenter during that interview was true. She even let Carpenter go through her phone and look at text messages between herself and appellant. In one of those text messages, appellant wrote, "[m]ake sure you have no panties on tonight since I didn't make it home to fuck you." L.M. testified that when she received that particular text message she became very upset. She stated, "I

10.

didn't, I didn't want to do it. I mean, you know, I don't want to take my panties off so he can fuck me."

{¶ 25} After L.M. reported appellant's sexual abuse to police, her living arrangements changed. Because she was trying to avoid contact with appellant, she stayed with Sandra Thomas for a couple of months until appellant moved out of the Perry's Glen apartment.

{¶ 26} L.M. provided Logan with a picture of L.M.'s bedsheet with sperm on it as evidence that appellant was having anal sex with her. L.M. stated that she had not been awake when that sexual encounter had taken place. She further testified that although she had not given appellant permission to have anal sex with her that night, that is, in fact, what he did.

### L.M. Cross-Examination

{¶ 27} During cross-examination, appellant's trial counsel questioned L.M. about whether or not she had an agreement with appellant that he could have sex with her while she was asleep. L.M. repeatedly said that no such agreement ever existed.

{¶ 28} At one point, when appellant's trial counsel asked L.M. whether there was any reason why she could not have just left the apartment, the state objected, arguing that the state did not have to prove either that L.M. resisted or that she refused consent. The trial court sustained the objection.

{¶ 29} L.M. testified that on one occasion, appellant had thrown a glass and had broken it because L.M. had refused to have sex with him. She explained:

11.

> We, we were talking about sex and having sex, and I kept telling him no, I didn't want sex. And that I did not like it. He was drinking that night and he had drank almost a fifth of, of Seagram's. Seagram's. And got really drunk on Seagram's because he was making the drinks really, really strong. And we were talking about sex and he got mad because I kept telling him no. So he threw the glass like this. Hit the cabinet, bounced off, hit the counter, and then hit the floor and slid across the floor and shattered.

The next morning, the victim woke up and her anus felt wet.

**Sandra Thomas**

{¶ 30} Sandra Thomas testified that she met the victim around Thanksgiving 2020. She stated, "I was in a program with my four grandchildren for domestic violence at Ruth Ann's House here in Port Clinton. And [L.M.] had come in as one of, another participant of the program." When asked about how she and L.M. had struck up a friendship, Thomas answered, "I clinged to her, she clinged to me pretty much right off the bat."

{¶ 31} Thomas confirmed that she had helped L.M. with household chores, including doing her laundry – even though L.M. "never wanted [Thomas] to do [L.M.'s] socks or her underpants or bras." Thomas stated that she noticed cuts in L.M.'s underwear and that when she asked L.M. about why the cuts were there, L.M. explained to her that appellant had cut the underwear while L.M. was asleep in order to "get to her so he could have sex." Thomas testified that she encouraged L.M. to go to the police.

12.

**Detective Corbin Carpenter**

{¶ 32} Port Clinton Police Detective Corbin Carpenter first became involved in this case when he and Officer Cochran interviewed L.M. Carpenter confirmed that L.M.'s statements during that interview were consistent with her testimony at trial. He further confirmed that during the interview, L.M. handed her phone over to him and that he scrolled through her text messages. In one of those text messages, appellant had written, "You always say no to sex because now you can't afford to buy Christmas presents." In the next message, he stated, "[B]ut it's always been your way." L.M.'s text response to these messages was, "I'm tired of having sex." During cross-examination, Carpenter referenced yet another text message from appellant to L.M., wherein appellant indicated that he understood that L.M. did not want to have sex with him due to L.M.'s prior experience with her ex-husband.

{¶ 33} Carpenter testified that he conducted a recorded telephone interview with appellant on January 12, 2022. Throughout the interview, appellant referred to having some sort of agreement with L.M. to the effect that once she took her medications at night and passed out, he was allowed to have sex with her. According to Carpenter, L.M. "specifically said there wasn't an agreement."

{¶ 34} During cross-examination, appellant's trial counsel asked Carpenter whether he had "any evidence to believe that [appellant's] story [was] untruthful." Carpenter responded:

> The, the one part that jumped up to me is that he kept saying
> that they had an agreement. And part of that agreement was if

13.

she had her panties on, he could have sex with her. But in the – when we did the, I think it's Exhibit 6, State's Exhibit 6, the statement, he sent her a text stating that, make sure you don't have any panties on tonight so I can come home and fuck you.

\* \* \*

To me, that's not consistent with his explanation of the, the agreement. The agreement he's, he's claiming is that if you have pajama pants on, I don't want sex. But if I'm wearing panties, it's all right. But then sends her a text, make sure you don't have your panties on so I can have sex with you.

{¶ 35} When asked on cross-examination about his previous statement that "you can't have sex with somebody who's sleeping because they can't say no," Carpenter explained, "I've had training, plus it's common sense that if I'm asleep, it does not give anybody any right to do anything or assault me or sexually abuse me in any way, shape, or form.'

## Crim.R. 29 Motion for Directed Verdict

{¶ 36} Following the conclusion of the state's case-in-chief, appellant's trial counsel made a brief oral motion for a directed verdict based upon testimonial evidence regarding the number of sexual batteries that were said to have taken place. The trial court denied appellant's motion for a directed verdict.

## Jury Instructions

{¶ 37} During the final jury instructions, the trial court admonished the jury that it was not appellant's burden to prove his innocence. The trial court also instructed the jury that they were the sole judges of the facts, the credibility of the witnesses, and the weight to be given to the evidence. The trial court instructed the jury regarding the offenses of

14.

sexual battery under R.C. 2907.03(A)(2) and (B) (involving a substantially impaired victim), and R.C. 2907.03(A)(3) and (B) (involving a victim who was unaware that the act was being committed).

{¶ 38} In conformity with appellant's trial counsel's request on the morning of the first day of trial, the trial court did not provide any jury instruction regarding the issue of consent. At the conclusion of the jury instructions, the trial court asked counsel whether they had any objection as to how the jury instructions had been laid out. Both parties answered that they did not.

## Closing Arguments

{¶ 39} Counsel for both parties made closing arguments. During appellant's closing argument, appellant's trial counsel argued that the state had failed to prove that the sexual conduct between appellant and L.M. was "without privilege" to do so. According to appellant's counsel, the alleged advance consent agreement between L.M. and appellant established a "privilege" that allowed him to have sex with her while she was asleep. The state responded to by suggesting that the word "privilege" should not be construed to include this kind of irrevocable consent.

## Jury Verdicts

{¶ 40} After deliberating for just under 6 hours, the jury found appellant guilty of Counts One and Seven, and not guilty of all of the remaining counts.

15.

## Assignments of Error

{¶ 41} Appellant asserts the following assignment of error on appeal:

    I.    The trial court erred by permitting the convictions because they violated the Fourteenth Amendment to the United States Constitution when applied to the instant facts.

## Analysis

{¶ 42} Appellant argues in his sole assignment of error that R.C. 2907.03(A)(2) and (3) violate the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution when applied to the particular set of facts in this case. Specifically, appellant takes the position that sexual activity with a sleeping party where there is advance consent from the sleeping party is a "fundamental right," and that given this fundamental right, it was plain error for the court not to instruct the jury on the "affirmative defense" of appellant's alleged advanced consent with L.M.

## Waiver

{¶ 43} We begin by considering the state's argument that appellant waived his sole assignment of error on appeal because he failed to raise this challenge in the trial court.

{¶ 44} "Failure to raise at the trial court level the issue of the constitutionality of a statute or its application, which issue is apparent at the time of trial, constitutes a waiver of such issue and a deviation from this state's orderly procedure, and therefore need not

be heard for the first time on appeal." *State v. Awan*, 22 Ohio St.3d 120 (1986), syllabus. Although the waiver doctrine set forth in *Awan* is discretionary -- meaning that "an appellate court may review claims of defects affecting substantial rights for plain error, even though the appellant failed to bring such claims to the attention of the trial court," *State v. Woods*, 2024-Ohio-467, ¶ 119 (8th Dist.), citing *In re M.D.*, 38 Ohio St.3d 149, 151 (1988); Crim.R. 52(B) -- discretion will not ordinarily be exercised to review such claims where the right sought to be vindicated was in existence prior to or at the time of trial. *State v. Heft*, 2009-Ohio-5908, ¶ 29 (3d Dist.), quoting *State v. Rice*, 2002-Ohio-3951, ¶ 7 (3d Dist.), quoting *State v. 1981 Dodge Ram Van*, 36 Ohio St.3d 168, 170-171 (1988), quoting *State v. Woodards*, 6 Ohio St.2d 14, 21 (1966). (Quotations omitted.)

{¶ 45} Because appellant's constitutional challenge -- based on an alleged "right of non-married heterosexuals to enter into a consensual agreement while awake to engage in consensual intimate activity while one party is sleeping based on signals derived from clothes being worn to bed" -- was apparent and available before and at trial, we decline to address it for the first time on appeal. *Compare State v. McCoy*, 2022-Ohio-995, ¶ 30 (12th Dist.) (appellant waived any challenge on appeal to the constitutionality of R.C. 2907.03(A)(5) (sexual battery, incest, as applied to defendant and his adult stepdaughter) by having failed to raise that challenge in the trial court); *State v. Summers,* 2014-Ohio-4538, ¶ 50 (3d Dist.) (appellant waived any challenge on appeal to the constitutionality of R.C. 2907.03(A)(7) (sexual battery, as applied to school teachers) by failing to raise that challenge in the trial court).

17.

**Affirmative Defense**

{¶ 46} Appellant also argues that the failure to raise his alleged advanced consent with L.M. as an affirmative defense was plain error.

{¶ 47} R.C. 2907.03, which governs the offense of sexual battery states that "[n]o person shall engage in sexual conduct with another, not the spouse of the offender, when any of the following apply:

(2) The offender knows that the other person's ability to appraise the nature of or control the other person's own conduct is substantially impaired.

(3) The offender knows that the other person submits because the other person is unaware that the act is being committed.

*See* R.C. 2907.03(A).

{¶ 48} R.C. 2907.01(A) provides that "sexual conduct" means "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, *without privilege to do so*, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another." (Emphasis added.)

{¶ 49} Appellant argues that "[w]hile lack of consent per se is not an essential element of sexual battery that the State needed to prove, the unique agreement between appellant and [L.M.] is an affirmative defense" that the jury was improperly precluded from considering. Specifically, appellant asserts that "[i]f this Court finds that

18.

Appellant's agreement, if true, implicates a fundamental liberty interest, this Court must find that the existence of such an Agreement, if found to be credible by the trier of fact, is material to guilt."

{¶ 50} In reviewing this argument, we first observe that consent has not been recognized in Ohio as an affirmative defense to the offense of sexual battery. *See State v. Franklin*, 2019-Ohio-1513, ¶ 38. As in the instant case, *Franklin* involved a challenge to the sufficiency of the evidence supporting a conviction for sexual battery in violation of R.C. 2907.03(A)(2) based on a claim of consent.

{¶ 51} Franklin was an Uber driver who had been hired to take the victim home. It was undisputed that the victim was very drunk. She testified that she had "no recollection of getting into the Uber, the ride home, or getting into her house." *Id.* at ¶ 15. "[T]he next thing she remembered was waking, bent over the bed, while [the defendant] was anally penetrating her."

{¶ 52} Franklin argued that R.C. 2907.03(A)(2) should be construed so as to require the state to prove an additional "implied element" of consent, and that "regardless of substantial impairment to a person's ability to appraise the nature of, or control of, his or her own conduct, that person may still possess the ability to consent." *Id.* at ¶ 18. The court rejected this argument, finding that it was without basis in the context of R.C. 2907.03(A)(2), which was "enacted with the purpose to 'forbid sexual conduct with a person other than the offender's spouse in a variety of situations where the offender takes unconscionable advantage of the victim[,]' including 'sexual conduct when the victim's

19.

judgment is obviously impaired.[.]'" *Id.* at ¶ 20, citing Legislative Service Commission

1973 comment to R.C. 2907.03.

{¶ 53} Franklin asserted as an alternative argument that consent was at least an affirmative defense to sexual battery. *Id.* at ¶ 21. The court rejected this argument on the grounds that a sufficiency of the evidence challenge was "inapplicable" when reviewing an affirmative defense claim, and that the burden of going forward with the evidence of an affirmative defense was upon the accused." *Id.* at ¶ 21. Ultimately, the court concluded that Franklin had failed to support his claim that consent was an affirmative defense to the offense of sexual battery as charged. *Id.* at ¶ 38.

{¶ 54} At least one California jurisdiction has squarely rejected the concept of "advance consent" to unconscious sexual conduct, explaining:

> [A] man who intentionally engages in sexual intercourse with a woman he knows to be unconscious is clearly aware that he is wrongfully depriving the woman of her right to withhold her consent to the act at the time of penetration. Since a woman may withdraw her consent to a sex act even after the initiation of sexual intercourse * * *, neither a woman's actual 'advance consent' nor a man's belief in 'advance consent' could possibly eliminate the wrongfulness of the man's conduct in knowingly depriving the woman of her freedom of choice both at the initiation of and during sexual intercourse.
>
> * * *
>
> The concept of an 'advance consent' to unconscious sexual intercourse is based on a fallacy. A decision to engage in sexual intercourse is necessarily an ad hoc decision made at a particular time with respect to a particular act. While a woman may expressly or impliedly consent to *conscious* sexual intercourse in advance, she remains free to withdraw that consent, and ordinarily has the ability to do so since she is conscious. Even if a woman expressly or impliedly

20.

indicates in advance that she is willing to engage in *unconscious* sexual intercourse, a man who thereafter has sexual intercourse with her while she is unconscious necessarily deprives her of the opportunity to indicate her lack of consent. The inherent risk that a man may misinterpret a woman's prior statements or conduct weighs strongly against recognizing 'advance consent' as a defense to rape of an unconscious person since the woman's lack of consciousness absolutely precludes her from making her lack of consent known at the time of the act. It follows that a man who intentionally engages in sexual intercourse with a woman he knows to be unconscious harbors a 'wrongful' intent regardless of whether he believes she has (or she actually has) consented in advance to the act.

*People v. Dancy*, 102 Cal.App.4th 21, 36-37 (2002). (Emphasis in original.)

{¶ 55} We agree with, and apply to the instant case, the analysis set forth in *Dancy.* Because Ohio's sexual battery statute was enacted with the purpose to forbid sexual conduct with a person other than the offender's spouse in a variety of situations where the offender takes unconscionable advantage of the victim, including sexual conduct when the victim's judgment is obviously impaired, we reject any notion of "advance consent" as a viable affirmative defense to the offenses of sexual battery under R.C. 2907.03(A)(2) and (A)(3).

{¶ 56} For the foregoing reasons, we find that the failure to raise appellant's alleged agreement as an affirmative defense was not error in this case.

21.

**Conclusion**

{¶ 57} Appellant's sole assignment of error is found not well-taken. The judgment

of the Ottawa County Court of Common Pleas is affirmed. Appellant is to pay the costs

of appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.
*See also* 6th Dist.Loc.App.R. 4.

Gene A. Zmuda, J.                          _____

                                               JUDGE

Myron C. Duhart, J.

                                  _____

Charles E. Sulek, P.J.                          JUDGE
CONCUR.

                                  _____

                                             JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.